No. 22962.

JAMES EDWARD HINTON *v*. THE PEOPLE OF THE STATE OF
COLORADO.
(458 P.2d 611)

Decided September 15, 1969. Rehearing denied September 29, 1969.

EDWARD H. SHERMAN, Public Defender, JOSEPH R. QUINN, Assistant, for plaintiff in error.

Duke W. Dunbar, Attorney General, John P. Moore, Deputy, Paul D. Rubner, Assistant, for defendant in error.

*En Banc.*

Mr. Justice Hodges delivered the opinion of the Court.

Plaintiff in error will be referred to herein as the defendant. He was convicted by a jury of murder in the first degree and sentenced to life imprisonment.

The defendant seeks reversal and assigns for our consideration a number of alleged errors. In this opinion, we have discussed only those alleged errors which we deem significant. The others, in our view, are without any merit or involve matters which clearly do not amount to any reversible errors.

We affirm the conviction and hold that the defendant was not prejudiced by any of the matters of which he complains, that he received a fair trial, and that the verdict of the jury is fully supported by the evidence.

The deceased was Tommie G. Hughes, a sixteen-year old girl. On the night of December 11, 1965, Miss Hughes had accompanied a girl friend, Twila Holmes, to a high school play. After the play ended, about 10:30 P.M., Miss Hughes and Miss Holmes accepted a ride in an automobile driven by a friend, Freddie Earl Fisher. They went first to a drive-in restaurant, where Miss Hughes saw her boy friend with another girl. This greatly upset her to the extent that Mr. Fisher decided to drive the two girls to another restaurant. After arriving at the second restaurant's parking lot, Mr. Fisher got out of his car and started talking to defendant and to another young man. Then, in a friendly manner, Mr. Fisher, defendant, and the third man entered the Fisher car. Both girls were in the front seat of the car with Mr. Fisher, the defendant seated himself in the back seat, directly behind Miss Hughes.

Miss Hughes was still upset about seeing her boy friend with another girl and was cursing. She had been drinking some liquor, and she was belligerent. When defendant asked Miss Hughes for a cigarette from a package which was lying on the dashboard in front of her, an argument ensued in which she cursed defendant and burned him on the hand with her cigarette. The defendant called her a bitch. Defendant then grabbed Miss Hughes around the neck with his arm, and while he maintained this hold on her, she continued to swear at him and called him offensive names.

Either Miss Hughes broke defendant's grasp or he released her from his hold. She left the Fisher car and went to a nearby parked car, in which Arlon Starr was a passenger. Miss Hughes knew Mr. Starr, and, using a tone loud enough to be heard by the occupants of the Fisher car, she asked him for a knife. Mr. Starr told her that he had no knife. She then slammed the door and walked to the front of Starr's car where she remained until the fatal stabbing.

Meanwhile, in Fisher's car, Miss Holmes saw defendant take a knife out of his pocket, saw the knife blade, and then observed defendant leave the car with the knife in an open position. With the open knife in his hand, defendant approached Miss Hughes, who was still standing by the other car. Miss Holmes and Mr. Starr each testified that they could see that both of Miss Hughes' hands were empty.

Standing alongside Starr's car, Miss Hughes and defendant appeared to quarrel for several minutes. During this time, the victim was crying and cursing. In the course of this altercation, defendant said to her: "Bitch, I'll kill you." Defendant stepped toward the girl and struck her in the face, using sufficient force to stagger her. She was bent over from the blow, and as she was straightening up, the fatal stabbing occurred.

The victim and Miss Holmes then walked to the police station, which was about 150 feet away, and from there

she was taken to the hospital. Surgery proved unavailing, and Miss Hughes died from the stab wound inflicted by the defendant.

The defendant testified in his own defense. His description of the events leading up to the infliction of the fatal wound is substantially the same as heretofore detailed, except in the following respects. Defendant testified that the victim walked toward him, then rushed upon him, at which time, he struck her a blow across the forehead with the back of the knife which he held in his right hand. He then backed off. She thereupon rushed upon him and into the open blade of the knife which he was holding in front of him in his right hand. He also testified that he did not open the blade of the knife until the victim started to approach him, but that he did have the knife in his hand when he emerged from the Fisher car. He related that as the victim approached him, she called him an offensive name and said "I'm going to kill you" and "I'm going to get you." The defendant said he believed she had a knife but that he never saw a knife because as she approached him and rushed at him, both of her hands were behind her. The other evidence in this case, of course, reflected that the victim did not have a knife in her hands at this time.

## I — SUFFICIENCY OF EVIDENCE

■ Defendant asserts that the trial court erred in overruling defendant's motions for judgment of acquittal, made at the end of the People's case and renewed at the close of all the evidence, because the evidence was insufficient to support a verdict of murder in the first degree. Neither the law nor the record supports this contention.

■ Under Colorado statutes, murder in the first degree, other than in the commission of a felony, is the *deliberate and premeditated* killing of a human being with *express malice* aforethought. *Watkins v. People,* 158 Colo. 485, 493, 408 P.2d 425; *Washington v. People,*

158 Colo. 115, 405 P.2d 735; *Ingles v. People,* 92 Colo. 518, 22 P.2d 1109.

█ The elements of *deliberation* and *premeditation* are established by proof of the formed design to kill, and length of time is not a determinative factor. The only time requirement for deliberation and premeditation within the meaning of the first degree murder statute is an interval sufficient "for one thought to follow another." *Bradney v. People,* 162 Colo. 403, 426 P.2d 765; *People v. Spinuzzi,* 149 Colo. 391, 369 P.2d 427; *Hammil v. People,* 145 Colo. 577, 361 P.2d 117; *Sandoval v. People,* 117 Colo. 588, 192 P.2d 423; *Maestas v. People,* 91 Colo. 36, 11 P.2d 227; *Robinson v. People,* 76 Colo. 416, 232 P.2d 672; *Van Houton v. People,* 22 Colo. 53, 43 P.137.

█ The element of *express malice* is defined by C.R.S. 1963, 40-2-2 as "that deliberate intention unlawfully to take away the life of a fellow creature which is manifested by external circumstances capable of proof." Thus, proof of a killing under deliberate and premeditated circumstances is proof of express malice. *Watkins v. People, supra* and *People v. Spinuzzi, supra.*

█ Our review of the record reveals competent evidence of "external circumstances" evincing a deliberate and premeditated killing. First, while still sitting in the Fisher car, defendant took from his pocket the knife used in the killing and opened the blade, which was approximately 5 to 6 inches long. Second, defendant got out of the car with the opened knife in his hand and sought out the deceased, who was standing near another car. Third, after thus confronting the deceased, defendant argued with her for several minutes, during which time he stated, "Bitch, I'll kill you." Defendant promptly followed these words with a staggering blow and then the fatal stabbing. From this evidence, the jury could find that defendant killed Tommie Hughes with deliberation and premeditation, and hence, with express malice.

Defendants' account of his actions and the victim's actions just prior to the infliction of the fatal knife

wound, conflicts with the other evidence. However, we cannot say the defendant's story was so probable and so credible that the jury, as a matter of law, could not disbelieve it.

 Defendant also places strong reliance upon the conflict between witness Starr's testimony that defendant stabbed Tommie Hughes with an upward blow and the medical testimony of a downward wound. This discrepancy in no way undermines the evidence from which the jury could find that defendant had a formed design to kill the girl and that he inflicted the fatal wound. The jury resolved the conflicting evidence by a verdict of murder in the first degree. The verdict being supported by competent evidence, the jurors are the final arbiters and their conclusion cannot be disturbed on review. *Sullivan v. People,* 111 Colo. 205, 139 P.2d 876; *Agnes v. People,* 104 Colo. 527, 93 P.2d 891; *Maestas v. People, supra.*

II — THE SELF-DEFENSE INSTRUCTION

 Defendant assigns the giving of Instruction No. 23 on self-defense as erroneous in several respects. We perceive no error. The Instruction was couched substantially in the language of C.R.S. 1963, 40-2-13, 14 and 15, and therefore proper. *Vigil v. People,* 143 Colo. 328, 353 P.2d 82. Wherever the statutory wording was changed in the Instruction, the effect is to ameliorate for defendant the import of the statute.

 Defendant argues that Instruction No. 23 was erroneous on the ground of surplusage, because it contained the full statutory definition of justifiable homicide stated in C.R.S. 1963, 40-2-13, which includes language inapplicable to the evidence in this case. However, the instructions given must be considered as a whole. The instructions in their entirety properly defined and limited the issues so that the jury could not have been misled, and hence, the surplusage was not error. *Armijo v. People,* 134 Colo. 344, 304 P.2d 633. We note that the only change from the verbatim text of C.R.S.

1963, 40-2-13 was the Instruction's addition of the word "apparently" before the phrase "necessary self-defense." This modification in the definition of justifiable homicide militates in defendant's favor.

Defendant also contends that Instruction No. 23 is objectionable, because it "is virtually an instruction on the 'retreat to the wall' doctrine." We find no such implication in the Instruction, which states the defendant's duty of conduct in the language of the statute. Moreover, defendant fails to mention Instruction No. 24, given immediately following the primary self-defense instruction, which reads:

"You are instructed that if the defendant was in a place where he had a right to be, he was not obliged to retreat or flee to save his own life, but in such circumstances had the right to stand his ground."

This instruction refutes any possibility that the trial court's charge to the jury imposed upon defendant a duty to retreat.

## III — THE INSTRUCTION AS TO DEFENDANT'S CREDIBILITY

The defendant testified in his own behalf, and now assigns as error the giving of Instruction No. 7, relating to defendant's credibility, which reads:

"When the defendant testified as a witness in this case he became the same as any other witness, and his credibility is to be subjected to the same tests as are legally applied to other witnesses. In determining the degree of credibility that shall be accorded to his testimony you have a right to take into consideration his demeanor and conduct on the witness stand, and also the fact that he is interested in the result of the prosecution."

It is defendant's contention that this instruction singles out and over-emphasizes the defendant's interest in the case; that it also prejudices the defendant by imposing a standard of credibility upon the defendant different than that of other witnesses testifying in the case. We do not agree. Even without being told, members of the

jury are fully aware of a defendant's interest in the case. This instruction merely tells the jury that they may do the very thing which common experience and common observation teach that the human mind will do inevitably.

Instruction No. 7 is consonant with long-established precedent in Colorado, and is virtually identical to the instruction given and first approved in *Boykin v. People*, 22 Colo. 496, 45 P.419. The more modern and better practice is to give one instruction on the credibility of witnesses, including a defendant who testifies in a criminal trial. However, as pointed out above, the giving of this instruction does not constitute reversible error.

IV — ADMISSION OF PHOTOGRAPH OF DECEASED

Defendant claims that the trial court erred by admitting into evidence People's Exhibit B, a photograph of the deceased, because the exhibit was inflammatory and without probative value. The photograph, which was taken of the corpse, showed the fatal knife wound and also the surgical incision made in an effort to save the life of Tommie Hughes.

The trial court unquestionably has discretion to determine whether a photographic exhibit is unnecessarily gruesome and inflammatory. Unless an abuse of discretion is shown, the trial court's decision as to admissibility of a photograph will not be disturbed on review. *Potts v. People*, 114 Colo. 253, 158, P.2d 739.

We find no abuse of discretion in the case at bar. A photograph of a deceased homicide victim is admissible in a criminal trial, if it depicts anything which it is competent for a witness to describe in words. *Bradney v. People*, 162 Colo. 403, 426 P.2d 765; *People v. Spinuzzi, supra; Martinez v. People*, 124 Colo. 170, 235 P.2d 810; *Potts v. People, supra.*

The fact that the photograph showed the surgical incision made after the stabbing does not affect admissibility. *Armijo v. People, supra.* Moreover, a medical witness carefully pointed out to the jury that the stab

555

wound was not coextensive with the suturing. Although defendant relies upon *Archina v. People,* 135 Colo. 8, 307 P.2d 1083, the prejudicial error created by the photographs admitted in that case stemmed from a factual situation strikingly different from this case:

From our examination of this record and of the briefs of counsel, we are convinced that defendant had a fair trial and that the verdict of the jury was warranted by the evidence.

Judgment affirmed.