## No. 26536

**The People of the State of Colorado v. Gerald Bruce Moreland, John Otto Hopper, and Joseph E. Valentine**

(567 P.2d 355)

Decided May 31, 1977.                    Rehearing denied August 22, 1977.

J. D. MacFarlane, Attorney General, Jean E. Dubofsky, Deputy, Edward G. Donovan, Solicitor General, Dan B. Fahrney, Chief Deputy District Attorney, Noland L. Brown, District Attorney, for plaintiff-appellee.

Rollie R. Rogers, State Public Defender, James F. Dumas, Jr., Chief Deputy, Dorian E. Welch, Deputy, for defendants-appellants.

*En Banc.*

MR. JUSTICE KELLEY delivered the opinion of the Court.

The three codefendants involved appeal their convictions for first-degree felony murder,[1] aggravated robbery,[2] and conspiracy to commit aggravated robbery.[3] We affirm as to Hopper and Valentine and reverse as to Moreland.

## I. Facts Relating to Offenses Charged

Moreland had been a neighbor of Jack Sudders (the murder victim) and his wife Vera. Mrs. Sudders testified to the following events. On the pretext of automobile trouble, the defendants came to the Sudders' residence and asked to use the phone. After using the phone, they left but returned ten minutes later. Defendant Moreland told Mrs. Sudders that the police had threatened to tow his car unless he moved it. Upon Moreland's

---

[1] 1971 Perm. Supp., C.R.S. 1963, 40-3-102. Now section 18-3-102, C.R.S. 1973 (1976 Supp.).
[2] 1971 Perm. Supp., C.R.S. 1963, 40-4-302. Now section 18-4-302, C.R.S. 1973.
[3] 1971 Perm. Supp., C.R.S. 1963, 40-2-201. Now section 18-2-201, C.R.S. 1973.

request, the Sudders' son George agreed to drive Moreland downtown, ostensibly to his brother's home, in return for a small payment. Defendants Valentine and Hopper then left, followed by George Sudders and Moreland.

Ten minutes after their second departure, Valentine and Hopper returned to the Sudders' residence. This time they stated that the police had moved their car and that they would wait for Moreland since he would return to the residence when he discovered that the car had been moved. Mrs. Sudders gave the two defendants coffee. As she reached for a towel to mop up the coffee spilled by Valentine, Valentine pushed her against the refrigerator, put a knife to her throat, and demanded guns and money. Valentine then instructed Hopper, who was standing close by, to look for guns. Hopper left the kitchen at which time Valentine removed Mrs. Sudders' bracelets and wedding ring. When he failed to find any guns, Hopper returned to the kitchen. Valentine renewed his demands as to the location of any guns and threatened to cut Mrs. Sudders' throat if she did not tell him.

Valentine then grabbed Mrs. Sudders by the wrist and said, "Let's go to the bedroom." At this point, Mrs. Sudders feigned a heart attack and slumped down. After Hopper had allowed her to smell some ammonia, Valentine continued to drag her toward the bedroom. During this episode, Mr. Sudders, who had been sleeping in the bedroom, awoke and told Valentine that his wife was having a heart attack and to leave her alone.

Mrs. Sudders continued to feign a heart attack and finally managed to escape out the front door. She testified that she ran from the house. She saw no one follow her. Later, while she was pounding on a neighbor's window for help, she heard a bang that may have been a gunshot.

The police and fire departments, who had responded to the scene by the time Mrs. Sudders reentered her home, found Mr. Sudders lying in the living room with a cocked revolver pointed at his head and a gunshot wound above his left knee. They administered first aid to Sudders, who had been bleeding profusely before he died.

The evidence at trial was that there was a trail of blood from the front porch into the living room. Traces of gunpowder were found on Mr. Sudders' hand, and more traces were found on his clothing in the groin area. In addition, Mr. Sudders was found clothed in pants and a sport shirt while he had been wearing only his underwear when Mrs. Sudders escaped. Finally, the evidence showed that the area between the Sudders' home and the neighboring home where Mrs. Sudders went for help was poorly lighted, and the line of vision was obscured by trees.

## II. Judgment of Acquittal

The defendants first argue that the trial court erred in not granting the defendants' motions for judgments of acquittal to the charge of felony murder since there was no proof beyond a reasonable doubt that Jack

Sudders' death was caused by the defendants.

The test adopted by this court for the propriety of a trial judge's denial of a motion for acquittal is

"Whether the relevant evidence, both direct and circumstantial, when viewed as a whole and *in the light most favorable to the prosecution,* is substantial and sufficient to support a conclusion by a reasonable mind that the defendant is guilty of the charge beyond a reasonable doubt."

*People v. Bennett,* 183 Colo. 125, 515 P.2d 466 (1973) (emphasis added). We have viewed the record in light of the standard enunciated in *Bennett* and hold that the trial judge did not err in denying the motions for acquittal. *See People v. Chavez,* 182 Colo. 216, 511 P.2d 883 (1973).

### III. Jury Instructions

The defendants next contend that the court misstated the law of felony murder in its instructions to the jury. In particular, they argue that the language contained in instruction 16 to the effect that the defendants could be found guilty "even if one or more of the defendants did not actually commit the act that caused said death"[4] is contrary to 1971 Perm. Supp., C.R.S. 1963, 40-3-102(1)(b)[5] as it has been interpreted by this court in *Alvarez v. District Court,* 186 Colo. 37, 525 P.2d 1131 (1974) (legislature intended to limit felony murder to deaths directly caused by a participant in the felony transaction).

In order to determine whether instruction 16 was proper, however, we must consider the instructions as a whole. *U.S. v. Beitscher,* 467 F.2d 269 (10th Cir. 1972); *People v. Sexton,* 192 Colo. 81, 555 P.2d 1151 (1976); *People v. Manier,* 184 Colo. 44, 518 P.2d 811 (1974); *McCune v. People,* 179 Colo. 262, 499 P.2d 1184 (1972).

Instruction 15 delineates the necessary elements of felony mur-

---

[4]Paragraphs one and two of instruction 16 provide:
"If you find beyond a reasonable doubt from all the facts and circumstances that the deceased, JACK SUDDERS, died from a gun shot wound inflicted by one or more of the defendants during the act of robbery or immediate flight therefrom then you must find the defendants guilty of Count 3 of the information.
"If you find beyond a reasonable doubt from all the facts and circumstances that the death of JACK SUDDERS was caused during an act of robbery committed by one or more of the defendants or immediate flight therefrom, you must find the defendants guilty of Count 3 of the information even though the act causing the death was casual or unintentional, and even if one or more of the defendants did not actually commit the act that caused said death."
[5]Now section 18-3-102(1)(b), C.R.S. 1973 (1976 Supp.).

der in language paralleling that of the statute[6]. In particular, items numbers one, three and four of the instruction require the jury to find that one of the defendants *caused* the death of the victim in the course of the robbery or, in immediate flight therefrom, in order to convict. Moreover, paragraph one of instruction 16[7] advises the jury that in order to find the defendants guilty, the jury must find that the victim died from a gun shot wound *"inflicted by one or more of the defendants"* (emphasis added).

Instruction 15 and the first paragraph of instruction 16 set forth the requirement that one of the participants in the felony inflicted the fatal wound. *Alvarez v. District Court,* 186 Colo. 37, 525 P.2d 1131 (1974). The second paragraph of instruction 16[8] in effect informs the jury that even if one or both of the *remaining* defendants did not actually inflict the wound, all the participants in the felony may be found guilty.[9]

The defendants' contention that instructions 24[10] and 25[11] misstate the law of felony murder because of the "proximate cause" language is without merit. The defendants themselves submitted instruction 24 after the court refused another instruction because of the lack of an evidentiary basis for it. Instruction 25 is a standard definition of proximate cause, given to the jury merely to clarify the language of the defendants' tendered instruction 24. The defendants cannot now assert prejudice from the language of their own instruction.

---

[6]"A person commits the crime of murder in the first degree if:

"Acting either alone or with one or more persons, he commits or attempts to commit Robbery, and in the course of or in furtherance of the crime that he is committing or attempting to commit, or of immediate flight therefrom, the death of a person, other than one of the participants, is caused.

"The elements of murder in the first degree are therefore:

"[1]. Acting either alone or with one or more persons,

"[2]. Committing or attempting to commit Robbery, and

"[3]. In the course of or in furtherance of Robbery or of immediate flight therefrom,

"[4]. Causing the death of a person, other than one of the participants.

"If, after considering all of the evidence, you find that the prosecution has established beyond a reasonable doubt that the defendants, GERALD BRUCE MORELAND, JOHN OTTO HOPPER and JOSEPH E. VALENTINE, acted in such a manner so as to satisfy all of the above elements at or about the date and place stated in the information, you should find the defendants guilty of murder in the first degree; if you do not so find, you should find the defendants not guilty of murder in the first degree."

[7]See note 5, *supra.*

[8]See note 5, *supra.*

[9]We note that none of the defendants made contemporaneous objections to instruction 16 on the grounds now alleged. Rather, an objection was made by counsel for defendant Valentine, and joined in by counsel for both Hopper and Moreland, to the language in instruction 16 which states that the defendants may be found guilty "even though the act. . . was casual or unintentional. . . ." The same limited objection was reiterated by all three defendants in their respective motions for new trial.

[10]"The Court instructs the jury that the death of Jack Sudders must have been proximately caused by the conduct of the defendants. If you find that the death of Jack Sudders was not proximately caused by the defendants' conduct or any one of them, or if you have a reasonable doubt with respect thereto, then your verdict must be not guilty."

[11]"Proximate cause means that cause which in natural and probable sequence produced the death of the victim. It is the cause without which the death would not have occurred."

■ Defendant Hopper alleges error in the trial court's refusal to give his tendered instruction 28.[12] We find no error, however, since there is no evidence in the record to support the defendant's theory that he left the premises and had no knowledge that Valentine was armed with a dangerous weapon.[13] *People v. Young,* 192 Colo. 65, 555 P.2d 1160 (1976); *Gould v. People,* 167 Colo. 113, 445 P.2d 580 (1968).

## IV. Erroneous Admission of Evidence

The defendants' final contention of error is that the trial court erred in admitting into evidence vials of blood, as well as photographs which depicted the death scene. They argue that, since two doctors testified that the decedent bled to death, the photographs had no probative value, were unnecessarily gruesome, and only served to inflame the jury.

■ We have previously held that photographs are not rendered inadmissible merely because they reveal shocking details of the crime. *People v. Steele,* 193 Colo. 87, 563 P.2d 6 (1977); *Hampton v. People,* 171 Colo. 153, 465 P.2d 394 (1970); *Monge v. People,* 158 Colo. 224, 406 P.2d 674 (1965). In *People v. Hosier,* 186 Colo. 116, 525 P.2d 1161 (1974), we held that the trial court has discretion to determine whether a particular photograph is unnecessarily gruesome and inflammatory. *See also People v. Steele, supra.* As we have frequently stated, photographs may be used to graphically portray the scene of a crime, the appearance and condition of the deceased, and any other matters which are competent for a witness to describe in words. *People v. Steele, supra; People v. Hosier, supra; Hinton v. People,* 169 Colo. 545, 458 P.2d 611 (1969), *cert. denied,* 397 U.S. 1047, 90 S.Ct. 1375, 25 L.Ed.2d 659 (1970). Absent the showing of an abuse of discretion, the trial court's ruling will not be disturbed on appeal. *People v. Steele, supra; People v. Jones,* 184 Colo. 96, 518 P.2d 819 (1974); *Hinton v. People, supra.*

■ In the present case, while many of the photos depict blood on the floor of the decedent's home, they show other evidence, including the weapon used and the general disarray of the scene of the crime. We find no abuse of discretion in the trial court's rulings.

---

[12]"You are further instructed, that the Defendant's theory of the case, is that he was in the residence of the deceased on October 21, 1973, and that he left the premise immediately following Mrs. Vera Sudders, and that he was in no way armed with a dangerous weapon, and he had no knowledge that his codefendant was so armed with a dangerous weapon, and after leaving the premises he has no knowledge of what occurred to the deceased, Jack Sudders. Therefore, if you find there is sufficient evidence to support the Defendant's John Otto Hopper, theory of the case, you may find the Defendant, John Otto Hopper, not guilty of the third count in the Information."
[13]There is, in fact, evidence that Hopper knew Valentine was armed.

The same standards for review apply to the admission of the vials of blood. Again, we find no abuse of discretion in the trial court's ruling.

## V. Ineffective Assistance of Counsel

Defendant Moreland contends that his sixth amendment right to effective assistance of counsel was violated when the court refused to grant his motion for a continuance and proceeded to trial immediately following the appointment of substitute counsel.

One month prior to commencement of the trial, Mr. Ransome, a public defender and counsel for Moreland, advised the court that a plea disposition with regard to Moreland had been agreed upon. Shortly before trial was to start, however, Moreland told his counsel that he did not wish to go through with the disposition. The defense counsel then advised the court of Moreland's decision, whereupon the trial judge determined that Moreland would go to trial as scheduled. Moreland's counsel objected, stating that since he had expected a disposition he had scheduled other trials for that week. When the court insisted that Moreland go to trial immediately, Ransome moved to withdraw, which motion was granted. The court then appointed Mr. Reinhard, an attorney in private practice, as substitute counsel for Moreland. After a short talk with Moreland, Reinhard advised the court that, in spite of the fact that he was totally unprepared, Moreland wished to proceed immediately to trial.

The people contend, however, that the court afforded Moreland his sixth amendment rights by ascertaining (1) that Moreland desired to proceed to trial; (2) that his new attorney would have time to prepare a defense; (3) that the substituted counsel was experienced; and (4) that the substituted counsel would be associating with other experienced counsel who had prepared for trial.

We agree with Moreland's contention. It is clear that when the court asked Moreland whether he desired to go to trial immediately he responded affirmatively. Under the circumstances, however, we do not deem his response to have constituted a waiver of his right to seek a postponement of the trial.

The record disclosed that while awaiting trial Moreland, who was 18 years old, had undergone several instances of deprivation and hardship in the county jail. After the court appointed substitute counsel, the following exchange occurred:

"The Court: I can see no reason why you should be sitting in jail over there for another six months - - -

"Moreland: Yes.

"The Court: - - - waiting for trial.

"Moreland: Yes, sir.

"The Court: And my calendar is crowded, and I want you to realize that. I want to try you as quickly as possible."

In light of his youth, the pressure which was brought to bear upon him, both in terms of the extremely unpleasant incidents at the county jail and

the negative inducement of returning to the county jail by the trial court, Moreland's waiver of his right to seek a postponement was ineffective. *See United States ex rel. Williams v. Twomey*, 510 F.2d 634 (7th Cir. 1975).

As for trial preparation, this court has previously held that sufficient time for preparation for trial is a necessary corollary to the effective assistance of counsel. *People v. O'Neill*, 185 Colo. 202, 523 P.2d 123 (1974). *See Wolfs v. Britton*, 509 F.2d 304 (8th Cir. 1975). Moreover, in *People v. White*, 182 Colo. 417, 514 P.2d 69 (1973), we held that

"[o]nly through pre-trial preparation can the defendant be assured that facts will be discovered which will disclose potential defenses to a reasonably diligent and competent defense counsel. In the absence of adequate pre-trial investigation — both factual and legal — knowledgeable preparation for trial is impossible. Without knowledgeable trial preparation, defense counsel cannot reliably exercise legal judgment and, therefore, cannot render reasonably effective assistance to his client."

*See West v. State of Louisiana*, 478 F.2d 1026 (5th Cir. 1973).

In the instant case the trial judge admitted that Mr. Reinhard was unprepared. The trial judge stated.

"the court is fully aware of the fact that you're not only entitled to be represented by an attorney . . . but you're entitled to have effective and competent representation. I know that Mr. Reinhard is an experienced and competent member of the bar. But I am also fully aware of the fact that he has not had an opportunity to actually investigate the case and prepare for trial."

The court continued, stating that Mr. Reinhard could give effective representation because of his experience and because he would be associating with "experienced and effective counsel who have investigated the trial and have — or the facts of this case [sic] — and they're ready for trial at this time." We hold that the ability to associate with counsel of codefendants who have prepared for trial can by no means, in such a serious case, be a substitute for actual trial preparation. Defenses may vary for each defendant,[14] and mere reliance upon the investigatory efforts of other counsel is no assurance of effective representation.

Accordingly, the trial court's judgment with regard to Moreland is reversed, and the cause is remanded for a new trial. The judgment is affirmed as to appellants Hopper and Valentine.

---

[14]*See, e.g.*, tendered instructions 29-32 where counsel for defendant Hopper asserted (1) that Hopper was unarmed, had left the premises, and had no knowledge of his codefendants' actions; and (2) that Hopper was too ill to form the intent to commit the crime. The court refused the instructions. We also note that, although the statutory affirmative defense to felony murder was not presented by Moreland's counsel, the defense was at least superficially available to Moreland while it would not have been available to defendant Valentine. 1971 Perm. Supp., C.R.S. 1963, 40-3-102(2). Now section 18-3-102(2), C.R.S. 1973.

MR. JUSTICE LEE and MR. JUSTICE CARRIGAN concur in part and dissent in part.

MR. JUSTICE ERICKSON dissents.

MR. JUSTICE LEE dissenting:

I respectfully dissent to part III of the majority opinion. I would also reverse the murder convictions of defendants Hopper and Valentine and remand for new trial, on the grounds that the trial court erroneously, or at least ambiguously, instructed the jury on the elements of felony murder.

The first paragraph of challenged instruction 16 provides that defendants could be convicted if the victim "died from a gun shot wound inflicted by one or more of the defendants." Paragraph two instructs that the defendants could be convicted "even if one or more of the defendants did not actually commit the act that caused such death." Considered alone, paragraph two clearly contradicts our holding in *Alvarez, Jr. v. Dist. Ct.*, 186 Colo. 37, 525 P.2d 1131, that felony murder under 1971 Perm. Supp., C.R.S. 1963, 40-3-102(1)(b), is limited to deaths directly caused by a participant in the felony transaction.

The majority opinion seeks to read the two paragraphs of instruction in instruction 16 in the conjunctive. As interpreted by the majority, instruction 16 provides that if the victim died from a wound inflicted by any one of the defendants the rest of the defendants may be convicted, although they did not fire the fatal shot.

It is at least equally plausible that the jury read the two paragraphs of instruction 16 as alternative grounds for conviction. The jury could easily have interpreted this instruction to mean that defendants could be convicted if (1) any of them fired the fatal shot, *or* (2) none of them caused the death, so long as it occurred during the robbery or subsequent flight.

This interpretation is more than idle speculation. The prosecuting attorney apparently adopted this reading of instruction 16 in arguing to the jury concerning appellants' defense that the deceased accidentally shot himself while pursuing them:

"But he's running toward the door. And while he is going toward the door, he's kicked the cylinder out or done something, and then he's cocked it and it discharges or he pulls the trigger and it discharges. Whatever way they want it, it doesn't make much difference. Well, that's about as impossible a sequence of events as I can imagine.

"But even if it's true, ladies and gentlemen, even if it's true, according to the instructions of the court you may still find the defendants guilty of first degree murder, which is the third charge.

"Instruction No. 16, the middle paragraph, states: [quoting portion stating that defendants may be convicted 'even if one or more of the defendants did not actually commit the act that caused said death.'

"That's the instruction of the court. Even if the defendants' wildest speculations have any truth to them whatsoever you must convict the three scum of that third count."

Nor does instruction 15 cure this error. That instruction sets out the elements of felony murder, including "[c]ausing the death of a person." Similarly, instruction 24 requires that defendants' conduct proximately caused the victim's death. But instruction 25 defines proximate cause as merely "that cause which in natural and probable sequence produced the death of the victim." It does not instruct the jury that one of the defendants must have actually pulled the trigger, as required by *Alvarez*.

In short, none of the instructions remedy the defect of instruction 16. At the very least, the giving of these confusing and contradictory instructions on the elements of the charge constituted plain error. *People v. Archuleta*, 180 Colo. 156, 503 P.2d 346; *People v. Morant*, 179 Colo. 287, 499 P.2d 1173. For these reasons, I would reverse the murder convictions of defendants Hopper and Valentine and remand the cause for new trial.

I am authorized to say that MR. JUSTICE ERICKSON and MR. JUSTICE CARRIGAN join in this dissent.

MR. JUSTICE ERICKSON dissenting:

I respectfully dissent. The combined effect of the errors which occurred in the course of trial were of such magnitude that the defendants were denied a fair trial. *Oaks v. People*, 150 Colo. 64, 371 P.2d 443 (1962). Accordingly, I would reverse and remand for a new trial.

MR. JUSTICE CARRIGAN concurring in part and dissenting in part:

I fully support the lucid dissenting opinion of Mr. Justice Lee and respectfully add the following:

I join the majority in upholding the aggravated robbery convictions of Hopper and Valentine and in granting Moreland a new trial. However, both law and logic require that Hopper and Valentine also be granted a new trial on the felony murder counts.

The felony murder doctrine evolved as a means of imputing felonious *intent* to characterize as murder a killing accidentally caused by one in the course of committing an intended felony such as robbery.[1] Instead of convicting the perpetrator only of the underlying robbery, and treating the homicide as non-criminal, accidental conduct because unintended, the felonious *intent* to commit the underlying robbery was imputed to the act of killing, thus rendering the killing a murder rather than an accidental homicide.

---

[1] The common law doctrine applied to felonies generally.

The next step in the process occurred when, during a felony committed by two criminals, one accidentally killed the victim. In such a case the *act* of killing could also be imputed to the co-felon, as a principal, accessory or co-conspirator. This was accomplished under the familiar doctrine that each such participant in a crime may be held responsible for the criminal *act* of his co-participant. Since each *participant* had the felonious intent to commit the underlying felony, thus justifying application to him of the imputed intent aspect of the felony murder doctrine, and each was legally responsible for the *acts* of the other committed in furtherance of the intended felony, it was not unjust to hold both for felony murder.

In the instant case, however, the majority carries the doctrine beyond its logical limits. Here the majority imputes to the robbers the *act* of an innocent third party — not within the circle of principal, accessory or co-conspirator. Our law traditionally holds one accountable for the deeds of those with whom one acts in concert, but not for the actions of all who happen to be present at the scene or for "acts of God." The mere coincidence that one is killed during the time span when a felony is being committed is not enough to justify invoking the felony murder doctrine.

Here, if the jury found that the victim shot himself accidentally, there should be no legal basis for imputing the victim's *act* to the defendants. Under the rule adopted by the majority, if during a robbery the victim were killed by lightning, the robber would be guilty of murder. The felony murder doctrine should be limited to cases where death is *caused* by the act of one of the co-felons.

Here there was ample evidence from which the jury may have inferred that the homicide victim accidentally shot himself, perhaps after the robbery was completed. He bled to death from a gunshot wound in his *leg* inflicted by a pistol his family kept hidden in the house. The gun was found next to him. He knew how to use guns, but not this particular pistol. The gun had no safety device, and easily could have fired accidentally. There was no evidence that any of the robbers knew where this pistol had been hidden in the house. There was no disarray of furniture or other sign of a struggle at the scene. The victim had no wounds except the one shot in his leg. No blood type other than that of the victim was found. No fingerprints of any of the defendants were on the weapon.

The issue is whether under the rule of *Alvarez v. District Court*, 186 Colo. 37, 525 P.2d 1131 (1972), which indisputably was the law applicable, it was prejudicial error to instruct the jury that the defendants could be convicted of felony murder "even if one or more of the defendants did not actually commit the act that caused said death."[2] Contrary to the law laid down in *Alvarez,* that instruction told the jury that the defendants could be guilty of murder even if the victim accidentally shot himself.

---

[2]Instruction 16.

Surely in this factual setting a jury properly instructed under the then-existing law might have had reasonable doubt whether one of the defendants fired the gun or the victim accidentally shot himself. Might not the jurors have wondered why a robber would shoot his victim *in the leg*? Why he would not "finish him off" so as to leave no witnesses? At least there was a legitimate fact issue who caused the death. Fair trial standards at least required submitting this issue to the jury under proper instructions.

As pointed out by Mr. Justice Lee, the prejudicial effect of this erroneous jury instruction was compounded by the prosecutor's overzealous argument that this instruction required the jury to "convict the three scum," regardless of who caused the death. While it is understandable that prosecutors, in the heat of argument, may injudiciously imply that some defendants are "beyond the pale" of the law's protection, we have a duty to apply the same law to all. No defendant is entitled to a perfect trial, but all are entitled to a fair trial. We cannot except from the guarantee of fair trial even the most loathsome, lest we erode this ultimate bulwark of all our liberties.

In a scene from the play *A Man for All Seasons*, Sir Thomas More, then Lord Chancellor of England, is berated by his zealously religious son-in-law, Roper, for not causing the arrest of one Rich who is obviously a "bad" man. More responds that he would let Rich go, "if he was the Devil himself, until he broke the law!"

"ROPER: So now you'd give the Devil benefit of law!

"MORE: Yes, what would you do? Cut a great road through the law to get after the Devil?

"ROPER: I'd cut down every law in England to do that!

"MORE: (Roused and excited) Oh? (Advances on Roper) And when the last law was down, and the Devil turned around on you — where would you hide, Roper, the laws all being flat? This country's planted thick with laws from coast to coast — man's laws, not God's — and if you cut them down — and you're just the man to do it — d'you really think you could stand upright in the winds that would blow then? Yes, I'd give the Devil benefit of law, for my own safety's sake."[3]

The rule of law that all are entitled to a fair trial requires a new trial on the felony murder charges for all three defendants. Valentine and Hopper received a fair trial on the aggravated robbery charges and I join in affirming those convictions.

---

[3] R. Bolt, *A Man for All Seasons* 66 (Random House, 1962).