### No. 27562

### The People of the State of Colorado v. Jesse Joe Reynolds

(575 P.2d 1286)

Decided February 6, 1978. Opinion modified and·as modified rehearing denied March 20, 1978.

J. D. MacFarlane, Attorney General, Jean E. Dubofsky, Deputy, Edward G. Donovan, Solicitor General, David K. Rees, Assistant, for plaintiff-appellee.

Rollie R. Rogers, State Public Defender, James F. Dumas, Jr., Chief Deputy, Thomas M. Van Cleave III, Deputy, for defendant-appellant.

*En Banc.*

MR. JUSTICE LEE delivered the opinion of the Court.

The defendant, Jesse Joe Reynolds, was convicted by a jury in the District Court of Moffat County of second-degree murder of one George Stuart Green. He was sentenced to a term of twenty to thirty years in the Colorado State Penitentiary.

We reverse the conviction because of the cumulative effect of the errors committed at his trial, which, in our view, precluded Reynolds from receiving .a fair trial. As this court has previously stated: "* * *[N]umerous formal irregularities, each of which in itself might be deemed harmless, may in the aggregate show the absence of a fair trial, in which event a reversal would be required. * * * " *Oaks v. People,* 150 Colo. 64, 371 P.2d 443.

The evidence established that in early July 1975 the defendant met one Danny Lee Williams for the first time in Steamboat Springs, Colorado. The next day, they hitchhiked together to Craig and became acquainted with decedent George Green. Green invited the defendant and Williams to his house to clean up from their traveling. Green and the defendant drank a considerable amount of wine. There was evidence that Green made separate homosexual propositions to both defendant and Williams. An altercation eventually ensued. Defendant was a man of large stature, standing 6'2" and weighing over 220 pounds, whereas Green was only 5'6" and weighed approximately 140 pounds. Defendant testified that when he rebuffed Green's advances Green responded by pulling out a knife and threatening him. Williams testified that defendant took the knife from Green and gave it to Williams to hide in the kitchen, which he did.

The evidence is confused as to what happened next. At one point, Williams went into the kitchen to cook some food. Green and the defendant became involved in a fight. Defendant testified that, while Williams was in the kitchen, Green had "grabbed" him in the eye. Defendant admitted that he responded by slapping Green with his open hand many times. Williams testified that he observed the defendant slapping, hitting, and kicking Green. Finally, since Green had suffered a severe nosebleed, the defendant and Williams carried him into the shower to stop the bleeding under cold water. After this, the defendant and Williams left the house.

Following a stop at a Craig tavern, defendant and Williams discovered an abandoned trailer where they could spend the night. Defendant went to sleep and Williams, who was concerned over Green's condition, went to the sheriff to report the events at Green's house. He led the officers to the defendant, who was immediately placed under arrest. It was about five to six hours after the altercation when Green was taken to the Craig hospital for medical attention.

Green was treated for facial cuts and bruises, a broken nose, and a fracture of his right arm. Examination revealed that his pulse rate and blood pressure were within normal limits. After treatment, he was released and returned to his home. Williams visited with Green later that night.

Williams met Green the next morning and the two of them took a one-half hour walk, ending at approximately 11 a.m. Green was later found dead in his living room at about 12:30 p.m.

Dr. Galloway, the People's pathologist who did the autopsy on Green, testified that the immediate cause of death was a severe fatty degeneration of the liver due to alcohol abuse. A physiological result of this type of liver condition is impairment of the ability of the blood to clot when an injury occurs. Dr. Galloway opined that the injuries inflicted upon Green caused him to bleed excessively because of his liver condition, thus producing

shock, and ultimately death. No tests, however, were made of Green's blood to ascertain whether its clotting ability had been impaired or whether it was in an anemic condition.

The defense admitted that Green and the defendant had fought, but vigorously disputed that the defendant had caused Green's later death. During the defendant's case, Dr. Wood, a pathologist, disagreed with Dr. Galloway's analysis. Dr. Wood testified that in his opinion Green died from aortic heart disease that had been complicated by his fatty liver condition. He specifically rejected Dr. Galloway's loss of blood-shock theory of death. When he was asked whether Green's normal blood pressure and pulse rate at the Craig hospital showed that his blood's clotting ability was not significantly impaired, on objection by the district attorney he was not permitted by the court to answer the question. Another physician, Dr. Johnson, also testified that it was highly unlikely that Green's death had been caused by the injuries inflicted by the defendant.

## I.

Initially, we reject the defendant's constitutional attack on the second-degree murder statute (section 18-3-103(1)(b), C.R.S. 1973). Defendant argues that he has been denied equal protection of the law because the same conduct is punished by two different penalties under the manslaughter and second-degree murder statutes.

Defendant misinterprets our decision in *People v. Calvaresi*, 188 Colo. 277, 534 P.2d 316. There we held that when conduct proscribed under two statutes is indistinguishable the legislature may not constitutionally impose different degrees of punishment for it. The facts in this case do not fit under *Calvaresi* because the manslaughter and second-degree murder statutes do not punish identical conduct. While the manslaughter statute requires that one "recklessly" cause a death, the second-degree murder statute requires an "intent to cause serious bodily injury." Since a different *mens rea* is required, different conduct is being punished, and there is no equal protection violation. *Accord, People v. Sexton*, 194 Colo. 250, 571 P.2d 1098; *People v. Hulse,* 192 Colo. 302, 557 P.2d 1205.

## II.

The defendant contends that the trial court erred in curtailing defense counsel's direct examination of defense witness Dr. John Wood. We agree.

The control over the extent of allowable examination of witnesses is generally a matter within the sound discretion of the trial court. *Ewing v. People*, 87 Colo. 6, 284 P. 341; *Burson v. Bogart*, 18 Colo. App. 449, 72 P. 605. This court, however, has not hesitated to reverse a trial court's decision if there has been abuse of discretion in restricting direct or cross-examination. *E.g., People v. Fresquez*, 186 Colo. 146, 526 P.2d 146; *Ohr v. Ohr*, 30 Colo. App. 540, 495 P.2d 1156. On the facts of this case, we find such an abuse of discretion.

The crucial issue in this case was whether the unlawful conduct of defendant was the criminal cause of Green's death. Defendant admitted that he had fought with Green, but contended that Green had quickly recovered from that fight. When Green was found dead the next day, the defendant had been in jail for about eighteen hours.

The district attorney's theory of the cause of death was that Green's severe fatty liver condition impaired the ability of his blood to clot. When he was beaten by the defendant, he bled excessively, causing him to go into shock and finally to die on the next day. The prosecution did not conduct any tests on the clotting ability or possible anemic condition of the blood to substantiate its theory. Thus, the prosecution's causation theory necessarily rested upon the testimony of Dr. Galloway, the pathologist who conducted the autopsy on Green. Dr. Galloway was of the opinion that Green died from the causes hypothesized by the prosecution.

To rebut this crucial testimony, the defense called Dr. Wood, a Denver pathologist. Utilizing the same information set forth in the autopsy report prepared by Dr. Galloway, Dr. Wood was of the opinion that the efficient cause of Green's death was aortic heart disease, complicated by the fatty liver condition. The critical factor in Dr. Wood's analysis was the undisputed fact that when Green was treated at the Craig hospital, about six hours after the fight, his vital signs — the blood pressure and pulse rate — were within normal limits. The defense then attempted to zero in on the crux of Dr. Galloway's damaging testimony that Green's blood was not clotting properly because of his fight with the defendant.

On this point, defense counsel asked Dr. Wood the following question: "Now, if a hemorrhage occurs such as is depicted in the injury stated as described by the autopsy report a fracture of the arm, the injuries to the face, and five or six hours later there is not instability of the normal signs, the vital signs, would you conclude as a matter of reasonable medical certainty that the impairment of the clotting factor was insignificant?"

The district attorney objected to this question on the ground that it had been "asked and answered," and the trial court sustained the objection on that basis. Again, defense counsel attempted to ask the same question in slightly different form, and the court again sustained the district attorney's objection to the offered evidence on the ground that it had been "asked and answered." Dr. Wood was not permitted to express his opinion on this critical factor in the causal chain resulting in Green's death. The People now admit that the question had not previously been asked or answered and that the court erred in excluding this evidence.

The People erroneously assert that this evidence was cumulative because Dr. Wood had already given his opinion as to the cause of death. We do not agree. The defense was attempting to rebut the particular conclusion of Dr. Galloway. One critical issue was whether the clotting ability of Green's blood had been impaired. Yet, Dr. Wood was not permitted to

respond to Dr. Galloway's damaging testimony. We hold that it was an abuse of discretion to severely curtail the direct examination of defendant's expert witness on this critical issue.

Although not specified as error here, we note further improper rulings by the trial court in sustaining the district attorney's general objections to hypothetical questions asked by defendant's counsel of his own expert witness. The general objections were made on the basis that the hypothetical questions did not include all of the material facts. When defense counsel asked the district attorney to specify which facts had been omitted, the district attorney refused to do so and the court sustained the objection.

■ Hypothetical questions must be carefully framed so as to fairly embody all of the material facts in evidence relating to the particular matter as to which the expert's opinion is sought. *Kale v. Douthitt*, 274 F.2d 476 (4th Cir.); *Mathiesen Alkali Works, Inc. v. Redden*, 177 Md. 560, 10 A.2d 699; *Wittenberg v. Onsgard*, 78 Minn. 342, 81 N.W. 14; *DeDonato v. Wells*, 328 Mo. 448, 41 S.W.2d 184, 82 A.L.R. 1331; *Oborn v. State*, 143 Wis. 249, 126 N.W. 737; *see generally* 31 *Am. Jur. 2d Expert and Opinion Evidence* § 57; 56 A.L.R.3d 300; *McCormick, Evidence* § 14 (2d ed.).

■ When, however, an objection is made on the basis of an absence of material facts, it is incumbent upon the objecting counsel to state specifically the material facts omitted from the hypothetical question. This allows the court to rule intelligently upon the objection and gives interrogating counsel an opportunity to amend and correct the defect in the question propounded. *Dameron v. Ansbro*, 39 Cal. App. 289, 178 P. 874; *Griswold v. Chicago Rys. Co.*, 339 Ill. 94, 170 N.E. 845; *Kunzman v. Cherokee Silo Co.*, 253 Iowa 885, 114 N.W.2d 534, 95 A.L.R.2d 673; *Adelmann v. Elk River Lumber Co.*, 242 Minn. 388, 65 N.W.2d 661; *Cobb v. Spokane, P. & S. Ry. Co.*, 150 Ore. 226, 44 P.2d 731; *Royal Indemnity Co. v. Smith*, 456 S.W.2d 218 (Tex. Civ. App.).

The court's erroneous ruling here could do no less than create an additional obstacle to a clear understanding by the jury of the defendant's theory concerning the cause of the death of the victim in this case.[1]

### III.

The defendant contends that there were two instances at trial where the prosecution improperly elicited testimony or commented on the defendant's exercise of his Fifth Amendment right to remain silent. We agree.

---

[1] We note that the trend is to liberalize the technical requirements concerning hypothetical questions. Rule 705 of the Federal Rules of Evidence dispenses with the requirement of a hypothetical question which states all of the material facts. The expert is allowed to give his opinion on an issue "without prior disclosure of the underlying facts or data." It is up to the cross-examiner to ferret out the underlying facts or data. The rationale for this rule is that it shortens the lengthy recitations of material facts by the questioner and precludes continual objections which waste valuable time and effort. *See McCormick, Evidence* § 16 (2d ed.).

After the defendant was arrested, he was interrogated by Officer James Purvines. At an *in camera* hearing during the trial, it became clear that the defendant had made a few statements when questioned but had then invoked his right to remain silent until a lawyer was present. When Officer Purvines testified at the trial, the following colloquy with the district attorney took place:

"Q. Did the defendant make any statement with regard to the incident that took place on that date for which he was arrested?

"A. The only thing he told us he had been there and there had been a hassle and he was only protecting himself."

The district attorney, however, continued with this line of questioning:

"Q. Did the defendant make any other statement?

"A. No, he wouldn't, and he just wouldn't talk to us anymore."

The second incident occurred during the cross-examination of the defendant. When the defendant testified that the deceased had "grabbed" him in the eye, the district attorney questioned him as follows:

"Q. Did you say anything to Danny about your eye?

"A. I didn't have time.

"Q. At anytime did you say anything to him.

"A. No, not that I recall.

"Q. As a matter of fact, this is the first time you have told anyone about it, isn't it?"

The defense made timely objections and motions for mistrial after each of these incidents.

■ Any comment at trial on the postarrest silence of a defendant, once he invokes his right to remain silent, may well violate a defendant's due process rights. *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91; *People v. Key*, 185 Colo. 72, 522 P.2d 719. Such commenting in effect penalizes a defendant for exercising his Fifth Amendment privilege to remain silent in the face of accusation. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974 (see especially n. 21). It is the duty of the prosecutor, in his role as an officer of the court, scrupulously to avoid making or inducing comments at trial that will prejudice the defendant for exercising his Fifth Amendment rights. *See ABA, Standards Relating to the Prosecution Function* §§ 1.1, 5.6(b).

■ The record shows that the district attorney was well aware that the defendant had invoked his right to remain silent. Moreover, from the *in camera* hearing, immediately prior to the in-court testimony, and from the officer's preceding testimony that this was the "only thing" the defendant had said, the district attorney should have been alerted that he had already elicited all of the statements the defendant had made. Not only was the prosecutor's question itself improper, it was so open-ended

that it invited the witness to make the further improper comment that: "No, he wouldn't, and he just wouldn't talk to us anymore."

It was also error for the district attorney, in the second incident, to ask: "As a matter of fact, this is the first time you have told anyone about it, isn't it?" The prosecutor's purpose here, of course, was to impeach the defendant's credibility by implying that he was fabricating a story. The use for impeachment purposes by a district attorney of a defendant's decision to remain silent when accused is precisely the prosecutorial conduct condemned in *Doyle v. Ohio, supra.*

In the case of *Hines v. People*, 179 Colo. 4, 497 P.2d 1258, we reversed a conviction for three errors, two of which are very similar to those here. Unlike the prosecutor in *Hines*, the district attorney here was careful not to compound the error by referring in his closing argument to the defendant's postarrest silence. Since we are reversing the conviction because of the cumulative effect of many errors, we need not determine whether these two errors in themselves constitute reversible error under the tests we announnced in *People v. Travis*, 192 Colo. 169, 558 P.2d 579, and *People v. Key*, 185 Colo. 72, 522 P.2d 719.

## IV.

During the testimony of Officer Ronald Shuck, the district attorney had him identify a color picture of Green's shower area. In the picture was a bucket filled with a cloudy reddish liquid. No chemical analysis of the liquid had been made. At an *in camera* hearing, the trial court admitted the exhibit after deciding that it was relevant and not unduly prejudicial. When defense counsel asked the district attorney if he intended to have anyone attempt to identify the contents of the bucket, the district attorney indicated that he saw no need to do so.

Nonetheless, when the jury returned, the district attorney asked Officer Shuck concerning what was depicted. He responded: "It is a picture of a bucket with stained water which I believed to have been blood at that time." Defense counsel immediately moved for a mistrial. The motion was denied and the prosecution decided to withdraw the exhibit. Over objection by defense counsel, the trial court gave a limiting instruction which included the statement that: "[T]he jury is instructed to disregard the reference to bloody water in the bucket."

■■■ We agree with the trial court that the exhibit was of sufficient relevance to be admitted into evidence, provided a proper foundation had been laid. To be admissible, a photograph must be shown to be what it purports to be and must be connected with either the perpetrator, the victim, or the crime. *See People v. Penno*, 188 Colo. 307, 534 P.2d 795; *Gonzales v. People*, 173 Colo. 243, 477 P.2d 363. The relevance determination is a matter for the discretion of the trial court. *People v. Bynum*, 192 Colo. 60, 556 P.2d 469. Since Officer Shuck personally viewed the place where the picture was taken and stated that the picture was a fair

and accurate representation of this place, the picture was certainly relevant.[2]

However, the subsequent "bloody water" testimony of the witness was improper. The witness had no factual basis on which to predicate this statement. The trial court had no opportunity to prevent it, as the district attorney had indicated that there would be no testimony on the bucket's contents. The district attorney should have instructed his witness to that effect. In addition, the trial court's instruction to the jury, given over defendant's objection, may well have further emphasized this improper testimony in the minds of the jurors. In sum, the testimony was improper and unduly prejudicial to the defendant.

## V.

We reject the defendant's challenge to the use of jury instruction No. 22, which deals with the credibility of witnesses. In relevant part, it reads:

"You are instructed that you are the sole judge of the credibility of witnesses *including the defendant* * * *." (Emphasis added.)

Defendant did testify in this case. However, he erroneously asserts that this instruction singled him out for stricter scrutiny than other witnesses received. This is not, however, a situation where a *separate* instruction on the defendant's credibility was given. *Cf. People v. Hankin*, 179 Colo. 70, 498 P.2d 1116; *Hinton v. People*, 169 Colo. 545, 458 P.2d 611, *cert. denied*, 397 U.S. 1047, 90 S.Ct. 1375, 25 L.Ed.2d 659. Rather, the court properly gave one *integrated* credibility instruction that merely mentions the defendant along with other witnesses. We approve the use of this instruction. *See Lamb v. People*, 181 Colo. 446, 509 P.2d 1267; *Colorado Jury Instructions (Criminal)* 3:8.

## VI.

In conclusion, we hold that the combined effect of the errors at trial prevented the defendant from receiving a fair trial, to which all defendants are entitled. *Oaks v. People*, 150 Colo. 64, 371 P.2d 443. We again observe that: "The duty of the prosecutor is to seek justice, not merely to convict." *ABA Standards Relating to the Prosecution Function* § 1.1(c).

The judgment is reversed and the cause remanded for a new trial.

---

[2]Of course, even relevant evidence can be excluded if its probative value is outweighed by its prejudicial effect. *See People v. Hancock*, 186 Colo. 30, 525 P.2d 435; *McCormick, Evidence* § 185 (2d ed.). We do not find that such a situation was present here.