The PEOPLE of the State of Colorado,
Plaintiff-Appellee,

v.

Ronald RUBANOWITZ,
Defendant-Appellant.

No. 82SA88.

Supreme Court of Colorado,
En Banc.

Sept. 4, 1984.

Rehearing Denied Sept. 24, 1984.

Duane Woodard, Atty. Gen., Charles B. Howe, Chief Deputy Atty. Gen., Richard H. Forman, Sol. Gen., Nathan B. Coats, Valerie McNevin-Peterson, Asst. Attys. Gen., Denver, for plaintiff-appellee.

David F. Vela, Colorado State Public Defender, Barbara S. Blackman, Deputy State Public Defender, Denver, for defendant-appellant.

KIRSHBAUM, Justice.

Defendant, Ronald Rubanowitz, appeals his jury convictions of child abuse, contributing to the delinquency of a minor, three counts of theft, criminal impersonation, charitable fraud, second degree forgery, and conspiracy to commit charitable fraud and second degree forgery. We affirm in part and reverse in part.

I

An information filed on November 8, 1979, alleged the commission of numerous offenses by defendant during his tenure as organizer and primary fiscal controller of The Untouchables Youth Rapport, Inc. (Untouchables). The information was filed after an extensive investigation by police officials into the fund raising activities and program operations of the Untouchables. The following facts established by the evidence at trial suggest the general context of the issues raised by defendant's appeal. Additional facts will be discussed when necessary to resolve specific issues.

In May 1976, the Untouchables began to solicit funds from private donors for its programs. Defendant was at that time the director of operations for a Littleton, Colorado fast food restaurant frequented by high school students. With the assistance of Duane Geerdes and two other friends, defendant publicized the Untouchables as an organization seeking to develop alcohol and drug rehabilitation programs, halfway houses, training centers, skating rinks and social clubs to assist troubled teenagers. Funds were collected in jars placed at local business establishments, and defendant obtained and publicized endorsements from several persons well-known to Denver area residents to encourage large scale support for the organization. Defendant also prepared and distributed written summaries of information purporting to illustrate the successes of the program. High school students, several of whom lived with defendant for various periods of time, often participated in solicitations for the program. In January of 1979, the Untouchables held a Las Vegas night, which included an auction and games of chance, to raise funds.

Only a small portion of funds collected during the solicitations were expended for the benefit of children. Much of the money was used by defendant for his own benefit. He consciously misrepresented the number of youths involved in the program, and instructed teenage fund raisers to misrepresent their experiences with

drugs and alcohol and to exaggerate the rehabilitative effect of their association with the program. A young girl who resided with defendant for a period of time was subjected to physical abuse by defendant and at defendant's direction. Defendant also prepared false information describing the nature and extent of programs of the Untouchables, the qualifications and activities of persons administering such programs, and successes of the programs.

## II

Defendant asserts that the prosecution's evidence failed to support his conviction of second degree forgery. We agree.

The written instruments relied upon by the prosecution to establish this charge against defendant were certain receipts prepared by various retail stores evidencing purchases of groceries by store patrons. As part of his fund raising efforts, defendant requested numerous persons to save the receipts from purchases of groceries and to give those receipts to the Untouchables. Defendant represented that a supermarket chain had agreed to pay to the Untouchables one cent for each dollar spent at any of the chain's retail markets, as evidenced by receipts. This representation was false.

The evidence with respect to defendant's utilization of grocery receipts established that defendant received numerous grocery receipts from friends and acquaintances representing purchases of goods from various grocery stores; that defendant maintained a grocery receipts column in the accounting records of the Untouchables purportedly representing expenses of the organization; that defendant also created an anonymous donations column in the account books; and that the dollar amounts entered in the grocery receipts column were based upon grocery receipts supplied by others, fictitious grocery receipts, and expenditures of funds by the Untouchables. To the extent the grocery receipts column reflected fictitious sums, the anonymous donor column which defendant also maintained reflected identical fictitious "dona-

tions." The inflated income and expense figures were used by defendant to present a false picture of the activities of the corporation.

The offense of second degree forgery is presently codified in section 18–5–103, 8 C.R.S. (1978), and states in pertinent part as follows:

(1) A person commits second degree forgery, if, with intent to defraud, he *falsely* makes, completes, alters, or *utters a written instrument* which is or purports to be, or which is calculated to become or to represent if completed:

(a) A deed, will, codicil, contract, assignment, commercial instrument, promissory note, check, or other instrument which does or may evidence, create, transfer, terminate, or otherwise affect a legal right, interest, obligation, or status

. . . .

(emphasis added) "Utter" and "written instrument" are defined in section 18–5–101, 8 C.R.S. (1978), as follows:

(8) "Utter" means to transfer, pass, or deliver, or attempt or cause to be transferred, passed, or delivered, to another person any written instrument, article, or thing.

(9) "Written instrument" means any paper, document, or other instrument containing written or printed matter or the equivalent thereof, used for purposes of reciting, embodying, conveying, or recording information, and any money, credit card, token, stamp, seal, badge, or trademark or any evidence or symbol of value, right, privilege, or identification, which is capable of being used to the advantage or disadvantage of some person.

Both sections 18–5–101 and 18–5–103 were enacted by the General Assembly in 1971. *See* Ch. 121, §§ 40–5–101 & 40–5–103, 1971 Colo.Sess.Laws 433, 433–35. Prior to this enactment, forgery offenses were charged pursuant to C.R.S. 1963, § 40–6–1. Section 40–6–1 contained no definitional section. It did, however, prescribe punishment for ut-

tering a written instrument. Section 40–6–1 provided in pertinent part as follows:

> Every person who ... shall utter, publish, or pass, as true and genuine, or cause to be uttered, published, or passed as true and genuine, any of the above named false, altered, forged or counterfeited matters as above specified and described, knowing the same to be false, altered, forged, or counterfeited, with intent to prejudice, damage, or defraud any person, body politic or corporate, whether the person, body politic or corporate, reside in this state or not; every person so offending shall be deemed guilty of forgery, and upon conviction thereof shall be punished by confinement in the penitentiary for a term not less than one year nor more than fourteen years.

The language is essentially equivalent to the contents of the initial forgery statute adopted by the Territorial Legislature of Colorado in 1861. *See* 1861 Terr. Laws Colo., Div. VII, § 67, at 302–03.

In *Cameron v. People*, 170 Colo. 504, 462 P.2d 606 (1969), we held that to obtain a conviction of forgery under the then applicable statutory provisions the prosecution must establish that the instrument in question was false and that the defendant knew or must have known of the falsity of the instrument when the defendant participated in the passing of the instrument. That guilty knowledge of a defendant accused of passing a forged instrument must be established under the provisions of the present statute was assumed, if not decided, in *People v. Brown*, 193 Colo. 120, 562 P.2d 754 (1977). The People argue that the present statute permits a conviction of forgery based on proof that a valid instrument was passed (uttered) with the intent to defraud. We find nothing in the statute, however, to suggest that the General Assembly intended to remove the requirement that a person guilty of forgery must have knowledge that the instrument in question is false or fictitious. If such interpretation

were adopted, the forgery statute could well overlap other statutes, such as section 18–4–401(1), 8 C.R.S. (1979), prohibiting theft by deception.

■■■ We hold that conviction of the offense of second degree forgery in the circumstances of an alleged uttering of an instrument requires proof that the instrument itself was false or fictitious and that the accused knew that the instrument was false or fictitious. The People do not suggest that, at the time of their use, the grocery receipts in question here were false or fictitious. Thus, as defendant argues, the evidence necessarily failed to establish that he knowingly uttered false documents. We therefore reverse defendant's conviction of second degree forgery.

## III

■■■ Defendant contends that his conviction of charitable fraud, in violation of section 18–5–115(1)(a), 8 C.R.S. (1978), must be set aside because that statute is unconstitutionally vague. In *People v. Moyer*, 670 P.2d 785 (Colo.1983), we held that the term "primary benefit" was too vague to satisfy due process requirements of the federal and Colorado constitutions. That decision is dispositive of the issue here raised. Accordingly, we reverse defendant's charitable fraud conviction.[1]

## IV

Defendant seeks reversal of two of his three convictions of theft on the ground that the information did not adequately inform him of the offenses with which he was charged. We disagree.

The second count of the information alleges commission of theft of $10,000 or more "between the 1st day of August, A.D. 1978, and the 31st day of January, A.D. 1979...." The third count of the information alleges commission of theft of things of value of $200 or more but less than

---

1. Because we reverse defendant's conviction under the charitable fraud counts, we do not treat defendant's other contentions that certain evidence was admitted in violation of *Stull v. People*, 140 Colo. 278, 344 P.2d 455 (1959), and that the People should have been required to elect a specific transaction which allegedly constituted the charitable fraud alleged in the information.

$10,000 "between the 1st day of February, A.D. 1979, and the 31st day of July, A.D. 1979...." In response to a motion for bill of particulars filed by defendant, the prosecution filed a response which provided the following information:

As to Count 2, between the dates set out in the information the defendant ... did accept donations for the untouchables and from those donations the defendant stole, misappropriated and converted portions of these funds ....

As to Count 3, between the dates set out in the information the defendant ... did accept donations for the untouchables and from those donations the defendant stole, misappropriated and converted portions of these funds through the use of false receipts and fraudulent accounting.

Defendant argues that these two counts of the information fail to state with sufficient particularity when the offenses occurred, and that the bill of particulars does not remedy such alleged defect.

■■■ An information is sufficient if it states the alleged charges in such manner as to permit the accused to prepare an adequate defense and to assure that the defendant cannot be prosecuted again for the same offense. *People v. Moore*, 200 Colo. 481, 615 P.2d 726 (1980); *People v. Albo*, 195 Colo. 102, 575 P.2d 427 (1978); Crim.P. 7(b)(2). In section 16–5–202, 8 C.R.S. (1978), the General Assembly has provided the following requirements respecting the sufficiency of an information:

(1) The information is sufficient if it can be understood therefrom:

(a) That it is presented by the person authorized by law to prosecute the offense;

(b) That the defendant is named therein, or described as a person whose name is unknown to the informant;

(c) That the offense was committed within the jurisdiction of the court, or is triable therein;

(d) That the offense charged is set forth with such degree of certainty that the court may pronounce judgment upon a conviction.

The general language of the second and third counts of the information satisfies these minimal requirements. *See People v. Flanders*, 183 Colo. 268, 516 P.2d 418 (1973).

In section 18–4–401(6), 8 C.R.S. (1978), however, the General Assembly has adopted additional standards for filing charges in criminal theft prosecutions. That statute provides as follows:

In every indictment or information charging a violation of this section, it shall be sufficient to allege that, on or about a day certain, the defendant committed the crime of theft by unlawfully taking a thing or things of value of a person or persons named in the indictment or information. The prosecuting attorney shall at the request of the defendant provide a bill of particulars.

Defendant asserts that this statute requires every information alleging the offense of theft to indicate a particular time at which such offense allegedly occurred. However, as we tacitly recognized in *People v. District Court*, 198 Colo. 501, 603 P.2d 127 (1979), in some circumstances crimes of theft may be perpetrated over a continuing period of time. The General Assembly has specifically recognized this possibility in section 18–4–401(4), 8 C.R.S. (1978), as follows:

When a person commits theft twice or more within a period of six months without having been placed in jeopardy for the prior offense or offenses, and the aggregate value of the things involved is two hundred dollars or more but less than ten thousand dollars, it is a class 4 felony; however, if the aggregate value of the things involved is ten thousand dollars or more, it is a class 3 felony.

In such situations, an information can be no more specific than the facts of the allegedly unlawful conduct dictate.

The two counts of the information challenged by defendant reflect the language of the statute. They describe the time during which the alleged unlawful acts were committed and recite additional par-

ticulars of how the alleged offenses were committed, who acted unlawfully, what was taken and where the offense occurred. The counts were sufficient to apprise defendant of the nature of the offenses with which he was charged and the period of time during which they allegedly occurred. *See People v. Tucker*, 631 P.2d 162 (Colo. 1981).

■ A bill of particulars is designed to enable a defendant to prepare a defense when the charging pleading, while sufficient to advise defendant of the nature of the charges against him, lacks sufficiently particularized information about the alleged offense reasonably necessary to the preparation of a defense or avoidance of surprise at trial. *See People v. District Court, supra.* The bill of particulars furnished the defendant here set forth precisely the nature of the conduct allegedly constituting theft. *See People v. Patrick*, 38 Ill.2d 255, 230 N.E.2d 843 (1967). While not a complete recitation of the prosecution's theory of the case, it was sufficiently detailed to permit defendant to prepare fully his defense to those charges. *See People v. Donachy*, 196 Colo. 289, 586 P.2d 14 (1978).

## V

Defendant seeks reversal of his conviction of child abuse under section 18–6–401(1)(a), 8 C.R.S. (1978),[2] on the ground that an instruction given by the trial court concerning this charge was erroneous. We disagree.

■ The instruction in question states in pertinent part as follows:

A person commits the crime of Child Abuse if:

He, without justifiable excuse, intentionally, knowingly or with criminal negligence causes or permits a child to be placed in a situation that may endanger

its life or health, or cruelly punishes said child.

The elements of Child Abuse are therefore:

1. Without justifiable excuse

2. Intentionally, knowingly or with criminal negligence causing or permitting a child

3. To be placed in a situation that may endanger the child's life or health, or cruelly punishing said child.

Defendant did not object to this instruction prior to the time it was read to the jury. Rather, in his new trial motion, he asserted for the first time that the instruction was deficient on the basis of *People v. Hoehl*, 193 Colo. 557, 568 P.2d 484 (1977). In these circumstances, any challenge to the instruction must be considered under the concept of plain error. Crim.P. 52(b); *Ramirez v. People*, 682 P.2d 1181 (Colo.1984). Thus, defendant must demonstrate not only that the instruction affected a substantial right, but also that the record reveals a reasonable possibility that the error contributed to his conviction. *Ramirez v. People, supra.*

■ Section 18–6–401(1)(a), as here applicable, defines child abuse as follows:

A person commits child abuse if he knowingly, intentionally, or negligently, and without justifiable excuse, causes or permits a child to be: Placed in a situation that may endanger the child's life or health....

In *People v. Hoehl, supra,* we held that the word "may" as contained in section 18–6–401(1)(a) means that there must be a reasonable probability that a child's life or health will be endangered from the situation in which the child is placed. While defendant, had he so requested, would have been entitled to an instruction explaining the full meaning of this statutory term, we must consider whether the lack of such instruction constitutes plain error in this

2. Subsection (1)(a) of § 18–6–401 was subsequently amended on May 6, 1980, to provide that:

A person commits child abuse if he knowingly, recklessly, or through criminal negli-

gence, and without justifiable excuse, causes or permits a child to be: Placed in a situation that endangers the child's life or health.... *See* Ch. 93, sec. 1, § 18–6–401, 1980 Colo.Sess. Laws 544.

case. Such inquiry necessarily requires a careful analysis of the evidence presented to the jury to ascertain whether the failure to define the term "may" can reasonably be said to have contributed to the jury's verdict. *See People v. Dillon*, 655 P.2d 841 (Colo.1982).

At trial, a young girl testified that when she was twelve years old and residing with defendant she was subjected to frequent spankings with a paddle by defendant and by others acting under his instructions. She also testified that on one occasion she was forced to take down her pants in front of defendant and other males to receive such a spanking; that she was forced by defendant on three or four occasions to eat soap until her gums bled; that defendant ordered others to take her to a bathroom, hold her by her ankles, put her head in the toilet and flush it; and that such events occurred three or four times a week.[3] In view of this evidence, which abundantly established a reasonable probability that the child's life and health might be endangered, the lack of an instruction defining "may" cannot be said to have reasonably contributed to defendant's conviction of this offense.

## VI

■■■ Defendant argues that he was denied his right to trial by a jury representative of a fair cross section of the community, in violation of federal and state constitutional guarantees. He also asserts that the procedures used to select the jury array violated state statutory provisions. We disagree.

Section 13–71–113, 6 C.R.S. (1973), contains the following relevant provisions:

(1) Within seven days after the moving party discovered or by the exercise of diligence could have discovered the grounds therefor, and in any event before the petit jury is sworn to try the case, a party may move to stay the pro-

ceedings, and in a criminal case to quash the indictment, information, or complaint, or for other appropriate relief on the ground of substantial failure to comply with this article in selecting the grand or petit jury.

. . . .

(3) The procedures prescribed by this section are the exclusive means by which a person accused of a crime, the state, or a party in a civil case may challenge a jury on the ground that the jury was not selected in conformity with this article.

At the post-trial evidentiary hearing conducted in this case, the trial court concluded that defendant could have discovered all of the grounds which form the basis of his challenge to the array well in advance of the commencement of trial. Defendant has not challenged this finding on appeal. Having failed to present his argument that the statute was not followed within the time limits prescribed by section 13–71–113(1), defendant cannot now assert such argument on appeal.

Defendant also asserts, however, that the procedures used to select the jury array during his trial violated his constitutional rights to a jury fairly representative of a cross section of the community. At a hearing held in connection with his new trial motion, the following facts were established concerning the jury selection procedures utilized at that time for the selection of jury arrays for Arapahoe County district court.[4] Each week approximately 150 names, compiled at random from potential juror lists prepared by the Colorado Judicial Department, were selected and placed in a jury wheel for the trials scheduled to commence in four divisions of the Arapahoe County district court. Two of these four divisions are located in the city of Aurora, Colorado. Potential jurors for trials set in the two Aurora divisions were selected first, and only names of Aurora

---

**3.** The only defense raised to these allegations was defendant's testimony that the spankings and the incident in which the girl's head was placed in the toilet never occurred.

**4.** The procedure hereafter described has been discontinued.

residents were placed in the pool of potential jurors for those two divisions.

To accomplish this distribution, the jury commissioner selected names at random from the jury wheel but placed only names of persons residing in Aurora into the panels for the two Aurora divisions. Names of other potential jurors were returned to the jury wheel. Thus, of the approximately 150 persons initially available for defendant's trial in Littleton, Colorado, forty-two Aurora residents were selected for service in the Aurora trials before any potential jurors were placed in the pool of potential jurors available for defendant's trial. As a result, the number of Aurora residents available for the trial of defendant's case was significantly reduced.

■ A defendant in a criminal trial is entitled to trial by a jury that is drawn from a cross section of the community in which the trial is held. *Thiel v. Southern Pacific Co.*, 328 U.S. 217, 66 S.Ct. 984, 90 L.Ed. 1181 (1946). Any systematic exclusion of distinctive groups in the community from the pool of names available for jury service in a particular case may result in a jury panel which does not reasonably represent the requisite community. *Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). In *Duren v. Missouri*, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), the United States Supreme Court adopted the following test which must be met by a defendant alleging systematic exclusion of a distinctive group of citizens from a jury pool:

> In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation

is due to systematic exclusion of the group in the jury-selection process. 439 U.S. at 364, 99 S.Ct. at 668.

We have adopted this standard with regard to Colorado's constitutional requirement of trial by a jury of peers. *People v. Sepeda*, 196 Colo. 13, 581 P.2d 723 (1978).

Defendant asserts that the practice employed to select his jury array unconstitutionally reduced the number of Aurora residents available for the trial of his case. Courts which have considered the question have concluded that *most* members of a city, town or county do not necessarily constitute a "distinctive" group for purposes of the federal constitutional guarantee of trial by an impartial and fairly representative cross section of the community. *Zicarelli v. Dietz*, 633 F.2d 312 (3d Cir. 1980), *cert. denied*, 449 U.S. 1083, 101 S.Ct. 868, 66 L.Ed.2d 807 (1981); *United States v. Foxworth*, 599 F.2d 1 (1st Cir.1979); *United States v. Butera*, 420 F.2d 564 (1st Cir.1970). *But see Alvarado v. State*, 486 P.2d 891 (Alaska 1971); *People v. Jones*, 9 Cal.3d 546, 108 Cal.Rptr. 345, 510 P.2d 705 (1973). In *United States v. Test*, 550 F.2d 577 (10th Cir.1976), the Tenth Circuit Court of Appeals defined a distinctive and cognizable group as one having some particular identifying quality or attribute, having a distinctive cohesiveness of attitudes, ideas or experience, and enjoying a distinguishing community of interest. The court stated that such distinguishing features must be established as a matter of evidence by the party challenging the array.

■ Defendant apparently assumes that geographical residence within the city of Aurora constitutes a distinguishing sociological factor for purposes of the constitutional test. No sociological, psychological or other evidence was introduced to indicate how residents of Aurora constitute a group with attitudes, ideas, or experiences significantly different from those of residents of Littleton.[5] An Aurora resi-

---

5. Defendant has attached to his appellate brief certain documents containing demographic statistics about Arapahoe County. Defendant also attached certain census information to his ap- pellate brief in this case. Such data was not presented at trial or in support of defendant's motion for new trial; it will not be considered on appeal.

dent, for example, may live directly across an artificial geographical dividing line from a Littleton resident. We cannot accept defendant's unsupported assumption that as a matter of law residents of a particular urban area constitute the type of distinctive group envisioned by constitutional guarantees of trial by a jury fairly representative of a cross section of a community. Thus, defendant failed to satisfy the first prong of the three-part test articulated by *Duren* and *Sepeda*.

■ Furthermore, the record contains no evidence to suggest that the remaining jury pool in this case failed to reasonably represent the community of Arapahoe County, wherein defendant's trial was held. We therefore conclude that defendant failed to establish a deprivation of his right under the federal and Colorado constitutions to a jury composed of a representative cross section of his community.

## VII

During the course of the trial, defendant's trial counsel filed two motions to withdraw from the case or, alternatively, for mistrial. Defendant argues that the trial court abused its discretion in denying these motions. We disagree.

The following pertinent facts concerning this aspect of the case are revealed by the record. On September 9, 1980, during presentation of the defendant's case-in-chief, a former employee of defendant testified that she worked with troubled teenagers at her home and at other locations on behalf of the Untouchables. On September 10, 1980, the prosecuting attorney informed the trial court that, with this witness' consent, a wiretap had been placed upon her home telephone on the evening of September 9. A tape recording made of a conversation between defendant and the witness on that night revealed that, at defendant's request, the witness had presented false testimony to the jury. The prosecution indicated that it intended to play the tape recording to the jury and to file witness tampering charges against defendant. At that point, defendant's two trial attorneys unsuccessfully moved to withdraw from the case or, alternatively, for a mistrial.

The motion to withdraw was based on the assertion that, as a consequence of defendant's conduct and the prosecution's intention to file additional charges against defendant, the attorneys would be potential witnesses during a trial on witness tampering charges; therefore, defendant would be deprived of the effective assistance of counsel for the balance of the present case. The attorneys relied on Disciplinary Rules 5–102 and 2–110(C)(1)(d) of the Colorado Code of Professional Responsibility in support of their motion.

Rule 5–102(A) states in pertinent part as follows:

> If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm ought to be called as a witness on behalf of his client, he shall withdraw from the conduct of the trial. . . .

Rule 2–110(C)(1)(d) provides that counsel may withdraw from employment when his client "[b]y other conduct renders it unreasonably difficult for the lawyer to carry out his employment effectively."

■ The former provision relates to the potential testimony of a lawyer during the trial of the matter for which the lawyer is presently employed by the client. *See Riley v. District Court*, 181 Colo. 90, 507 P.2d 464 (1973). Any testimony of defense counsel concerning witness tampering charges would be elicited in a subsequent proceeding against defendant; Rule 5–102, therefore, has no direct bearing on the propriety of the trial court's ruling.

■ The question of whether, pursuant to Rule 2–110(C)(1)(d), an attorney may cease representing a party during the course of a trial because of conduct by the client is a matter which of necessity must be committed to the discretion of the trial court. *People v. Schultheis*, 638 P.2d 8 (Colo.1981). In ruling on an attorney's request to withdraw during trial, the trial court must balance the need for orderly

administration of justice with the facts underlying the request. Such factors as the point in time at which the motion is made, the inconvenience to witnesses, and the possibility that any new counsel would be faced with similar difficulties are among those which may be considered by the trial court in balancing those interests. *Id.*

 In this case, defendant's conduct occurred late in the proceedings, during the presentation of the defendant's case-in-chief. Problems created by defendant's conduct were difficulties which would confront any lawyer subsequently selected to represent defendant in this case. Considering all of the circumstances, we conclude that the trial court did not abuse its discretion in denying the requests for leave to withdraw as counsel. Similarly, the denial of defendant's alternative request for a mistrial did not constitute an abuse of discretion; a defendant may not by his own conduct force a declaration of mistrial. *See, e.g., People v. Shackelford,* 182 Colo. 48, 511 P.2d 19 (1973).

### VIII

Defendant asserts that his right of confrontation was impermissibly constrained by the trial court's ruling that he could not question a prosecution witness who had been granted immunity from prosecution concerning the penalties associated with charges which could have been filed against such witness. We disagree.

On direct examination, Duane Geerdes, one of the principles in the Untouchables organization, gave testimony concerning many illegal acts of defendant. Prior to commencing cross-examination of Geerdes, defense counsel requested permission by an oral motion *in limine* to ask the witness about his understanding of the grant of immunity afforded him by the prosecution, including his knowledge of possible penalties. The trial court granted the request to inquire into Geerdes' understanding of the grant of immunity, and stated that defense counsel could inquire as follows:

whether or not [the witness] realized that he could have been charged with crimes

that would have constituted felonies, and make inquiry as to specific charges that are pending against the defendant in this case and ask if he understood those charges could be leveled against him.

On cross-examination, Geerdes ultimately testified that he understood the grant of immunity to include any testimony "relevant to the charges that the defendant is being charged for, or my acts which were also involved in them" and that the grant of immunity protected him.

 The right of a defendant in criminal prosecutions to confront adverse witnesses is a fundamental element in the panoply of constitutional protections afforded those accused of crime. U.S. Const. Amend. VI; Colo. Const. art. II, § 16. That right is tempered, however, by the recognition that a trial court retains discretion to limit cross-examination by any party which would elicit testimony in itself inadmissible or which probes matters immaterial to issues of bias or prejudice. *People v. Scheumann,* 190 Colo. 474, 548 P.2d 911 (1976); *People v. Simmons,* 182 Colo. 350, 513 P.2d 193 (1973). Within this framework, the motives of those who testify against a defendant may be fully explored to establish possible bias or prejudice. *See Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); *People v. King,* 179 Colo. 94, 498 P.2d 1142 (1972). Because the extent to which cross-examination may appropriately be limited without violating a defendant's constitutional right of confrontation necessarily depends on the particular circumstances of particular criminal proceedings, such determination is committed to the discretion of the trial court. *People v. Raffaelli,* 647 P.2d 230 (Colo.1982).

In *People v. Loscutoff,* 661 P.2d 274 (Colo.1983), we concluded that the trial court did not abuse its discretion in prohibiting the defendant from asking a prosecution witness whether the witness had been informed of the potential penalty for a particular crime. At the *in camera* hearing held to consider the defendant's request to interrogate the witness about potential pen-

alties, the prosecution stated that it had determined not to prosecute the witness for that particular crime because of insufficient evidence. The *in camera* hearing also revealed that possible penalties had not been discussed with the witness by the prosecutor.

■ Here, as in *Loscutoff*, no charges had been filed against Geerdes. The record of the trial proceedings does not indicate whether Geerdes had ever discussed potential penalties with the district attorney's office. More importantly, the defendant was permitted to fully explore Geerdes' motives for testifying. In these circumstances, the ruling did not constitute an abuse of discretion. *See People v. Leonard*, 644 P.2d 85 (Colo.App.1982).

■ Defendant also argues that the trial court erred in refusing to give a special instruction to the jury with regard to the credibility of this prosecution witness. We have previously concluded that special credibility instructions normally are to be avoided because they unduly focus the attention of jurors upon a particular witness. *See People v. Estorga*, 200 Colo. 78, 612 P.2d 520 (1980); *Hinton v. People*, 169 Colo. 545, 458 P.2d 611 (1969), *cert. denied*, 397 U.S. 1047, 90 S.Ct. 1375, 25 L.Ed.2d 659 (1970). We adhere to that conclusion. A general credibility instruction, as was given in this case, adequately informs the jury of its role concerning the evaluation of testimony, including evaluation of the credibility of any particular witness. *See Luna v. People*, 170 Colo. 1, 461 P.2d 724 (1969).

### IX

Defendant argues that the trial court erred in permitting cross-examination by the prosecution concerning a 1967 arrest which defendant had sustained in California. We disagree.

At trial, defendant repeatedly testified that his interest in helping troubled children was of long-standing duration. He related that interest to the fact that as an eleven-year-old he himself had been involved in such conduct as car theft, driving without a license, assault and battery, and resisting arrest. In describing his activities as the owner of a health club in El Segundo, California, from 1964 until 1966, he volunteered that "In 1966 I still had my health club but I was working with kids on an informal basis. All during this period of time I worked with kids." When asked, "Where did you work with kids in 1966?" by his counsel, defendant responded, "From out of my health club."

Prior to commencing his cross-examination of defendant, the prosecuting attorney requested permission from the trial court to explore the circumstances of an arrest of defendant on charges that on January 18, 1967, defendant offered to provide an undercover police officer with a girl who would perform acts of oral sex with the officer. The prosecutor stated that because the charges resulted in a deferred prosecution rather than any conviction, the evidence was not offered for purposes of impeachment. The prosecutor argued that he nevertheless was entitled to explore this particular incident because of defendant's testimony that at that time he was operating a legitimate health club out of which he helped children. To establish the basis for the proposed cross-examination, the prosecutor tendered an exhibit consisting of a police report and certain court documents.

Defendant objected to the prosecution's request and tendered an exhibit consisting of several court documents to support his objection. Agreeing that the prosecution's proffered evidence was inadmissible for purposes of general impeachment, the trial court made the following statement:

As I understand [the prosecutor's] viewpoint, he is attempting to cross-examine or intends to cross-examine about the matter of the testimony about the health club and I would think that if questions could be asked about that within the scope of the direct examination, that it would not be necessary to refer to these records if the witness responds in a way that the prosecutor feels is accurate.

If he doesn't respond in that way and the prosecutor feels that he should use

these documents to impeach the witness, that is his intention ....

Defense counsel then argued that the prejudicial effect of such evidence outweighed its probative value. In rejecting this argument, the court ruled as follows:

I would not allow the prosecutor to make any reference to these arrest records unless the witness denies the incident. If the witness admits the incident in limited cross-examination I will not allow any reference to the arrest record.... What I'm saying is I don't want any unnecessary prejudice to the witness, but I do not see how the prosecutor can be prevented from going into any matters that were inquired into on the direct examination.

The trial court asked the prosecutor to indicate the specific questions he intended to ask the defendant, and the prosecutor requested a recess to do so.[6] After noting that a thirty-seven minute recess was taken, the record contains the following cryptic statement by the trial court:

[C]ounsel have met with the Court in chambers and the Court indicated that they had reached a conclusion that the district attorney will be allowed to inquire of the Defendant concerning the matter in question, and as to the two exhibits, they have been admitted.

On cross-examination, defendant admitted that he operated the health club in question during the early part of 1967. The following questions and answers then occurred:

Q. With reference to your health club in El Segundo, California, isn't it a fact that health club you were running was being used as a front for prostitution?

A. No sir, it wasn't.

Q. Directing your attention to the 18th of January of 1967, isn't it true that you were arrested after making a deal with an undercover police officer wherein you offered to provide him with oral sex from a girl in exchange for money?

A. I was arrested for the charge. Those were the alleged charges.

Q. And this is where you testified you were helping kids?

A. I was helping kids out of this health club.

Q. And that included the girl who you offered to the police officer?

A. That was alleged and the case was dismissed.

The record reveals that counsel did not object to any of these questions.

Defendant argues on appeal that the prosecutor's questions and the admission of the two exhibits violated CRE 403 and CRE 608. In spite of the trial court's statement that during the recess counsel for the defendant and the prosecution "reached a conclusion that the district attorney will be allowed to inquire of the Defendant" concerning the circumstances of the arrest, we will assume for purposes of appeal that defendant did not waive his initial objection to this line of inquiry.

Rule 403 of the Colorado Rules of Evidence allows trial courts to exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice." By necessity, the ultimate ruling is committed to the discretion of the trial court. The trial court must consider the probative value of the proposed evidence which, since relevant, would normally be admissible, in light of the nature of the case, the nature of the offered evidence, and the other evidence admitted during the trial. Absent an abuse of dis-

---

**6.** The prosecution made the following statement in support of its request for permission to inquire into the incident:

[I]f I understand the incident, the police department sent an undercover agent in and met the defendant at his place of business, the health club, who explained to the undercover officer the nature of the services available, including various sex acts.

That the undercover officer paid the defendant some money or—or the girl he was introduced to some money, $35. I would have to review the reports again, but $35 for oral sex and after the oral sex just began, the arrest was made. Both the Defendant and the girl were arrested.

cretion, the trial court's ruling will not be disturbed on appeal. *See, e.g., People v. Abbott,* 638 P.2d 781 (Colo.1981); *People v. White,* 199 Colo. 82, 606 P.2d 847 (1980).

■ The proposed evidence was significant to the prosecution's general theory that defendant used youths to obtain funds to benefit defendant. It was the only evidence available to indicate that defendant's testimony that his benevolent concern for young people was manifest as early as 1966 in El Segundo, California, was false. Thus, this evidence had significant probative value.

On direct examination defendant testified that he had committed many illegal acts as a youth. In view of this evidence, any additional prejudicial effect of the proposed evidence was somewhat reduced. The trial court also took steps to further reduce potential prejudice by requiring the prosecution to frame the precise questions contemplated before asking them. In these circumstances, we conclude that the trial court's ruling did not constitute an abuse of discretion.

■ Defendant also argues that this evidentiary ruling violated the provisions of CRE 608. That rule of evidence contains the following pertinent provisions:

(a) Opinion and Reputation Evidence of Character. The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but subject to these limitations:

(1) The evidence may refer only to character for truthfulness or untruthfulness....

(b) Specific Instances of Conduct. Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility ... may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning his character for truthfulness or untruthfulness ....[7]

As we recognized in *People v. Taylor,* 190 Colo. 210, 545 P.2d 703 (1976), decided prior to the adoption of CRE 608, and in *People v. Cole,* 654 P.2d .830 (Colo.1982), decided after adoption of the rule, evidence of specific past conduct of a party is not admissible to establish the general character of the party. The prohibition against the admissibility of such evidence for that purpose, however, does not prevent cross-examination of an adverse party or witness concerning the truthfulness of specific substantive direct testimony. *See Molton v. People,* 118 Colo. 147, 193 P.2d 271 (1948). While this distinction may be difficult to apply in many contexts, enforcement is essential to that aspect of our adversary system which depends upon vigorous challenges to testimony deemed false or impermissibly misleading.

The prosecution here did not seek to elicit evidence concerning any character trait of untruthfulness defendant might be said to have. The trial court, the prosecutor and the defendant all agreed upon that point. The evidence was offered to contradict defendant's substantive direct testimony that he ran a legitimate health club business in California from 1964 to 1966 and that in the course of operating such business he attempted to benefit troubled children. The trial court's decision to permit limited cross-examination to establish the inaccuracies inherent in this portion of defendant's direct testimony did not constitute an abuse of discretion in the context of the trial setting.

Defendant's argument that the admission of the two exhibits containing police reports and court documents concerning this incident constituted error must also be rejected. The record indicates that the exhibits were tendered in support of the parties' positions regarding the prosecutor's request for permission to cross-examine defendant concerning the arrest. The record does not indicate the basis for their ultimate admission. The documents themselves were not discussed before the jury,

---

**7.** The rule has since been amended, effective July 1, 1981.

and defendant does not assert they were actually examined by the jurors. The prosecution's exhibit was admitted only conditionally, in the event defendant denied the incident. We find no reversible error under these circumstances.

### X

Finally, defendant argues that during the course of the trial the prosecution engaged in misconduct that cumulatively resulted in such prejudice that defendant's convictions must be reversed. We disagree.

 Defendant first asserts that certain activities of Robert Sexton, an investigator for the prosecution, constituted prosecutorial misconduct. In June or July of 1979, Sexton was placed in charge of a then two-year-old general investigation into the activities of the Untouchables. On September 10, 1979, while Sexton was interviewing the child named in the information later filed against defendant as the victim of child abuse, defendant unexpectedly entered the child's residence, interrupting the interview, and began to describe the activities of the Untouchables. Sexton told defendant to cease his comments and to consult his attorney.

On September 13, 1979, Sexton and other prosecution investigators met with defendant and defendant's attorney,[8] at which meeting defendant volunteered certain information and agreed to provide Sexton with receipts and records of the Untouchables. Defendant was advised by his attorney not to hold any further discussions with or disclose any documents to police investigators in the absence of said attor-

ney. Sexton and defendant did meet on two occasions subsequent to September 13, in the absence of defendant's attorney, at which meetings defendant gave Sexton certain documents. Sexton at no time informed defendant of the rights articulated in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).[9]

Defendant argues that Sexton's conduct violated ABA Standard 3–3.2(b), which states as follows: "Whenever a prosecutor knows or has reason to believe that the conduct of a witness to be interviewed may be the subject of a criminal prosecution, the prosecutor or the prosecutor's investigator should advise the witness concerning possible self-incrimination and the possible need for counsel." *ABA Standards for Criminal Justice*, "The Prosecution Function," 3–3.2(b) (2d ed. 1980). Defendant also asserts that Sexton's conduct violated Disciplinary Rule 7–104(A)(1) of the Colorado Code of Professional Responsibility.[10]

In denying defendant's motion to suppress evidence obtained at these meetings, the trial court found that defendant was at all times free to leave, that Sexton used no coercive tactics, and that defendant acted voluntarily and in disregard of his attorney's advice at all times.[11] The evidence simply fails to substantiate defendant's argument that Sexton's conduct must be considered an intentional effort to circumvent defendant's right to be accompanied by defense counsel.

Certainly the circumstances of a preliminary investigation by prosecution officials may require investigating officers to warn

---

8. Defendant was represented by other attorneys at trial.

9. In a pretrial suppression hearing, the trial court denied a motion to suppress all evidence gathered as a result of subsequent discussions between Sexton and defendant at which defendant's attorney was not present. That ruling has not been appealed.

10. DR 7–104(A)(1) provides as follows:
 (A) During the course of his representation of a client a lawyer shall not:
 (1) communicate or cause another to communicate on the subject of the representation

with a party he knows to be represented by a lawyer in that matter unless he has the prior consent of the lawyer representing such other party or is authorized by law to do so.

11. During the suppression hearing, Sexton denied the existence of any agreement to eschew further discussions with defendant in the absence of defendant's attorney. Defendant's counsel testified that on September 13, 1979, he advised defendant not to turn over any documents without permitting said counsel to see them first.

persons who are to be questioned that they should consult with their attorneys before giving information to police officials. Sexton so advised defendant on September 10, 1979. After September 10 defendant was acting with the benefit of his lawyer's advice. From that point on, defendant knew he was the subject of preliminary investigations; thus, the policy of advance warning to potential defendants which underlies ABA Standard 3–3.2(b) and Disciplinary Rule 7–104(A)(1) was fully satisfied here.

 The second incident of alleged prosecutorial misconduct concerns questions propounded at trial by the prosecutor on redirect examination of the victim of the child abuse. In cross-examining this witness, defense counsel discussed the contents of a taped interview of the victim. During redirect examination, the prosecutor asked the following question: "Certain portions of that tape were erased, weren't they?" The witness answered, "Yes." Defendant then moved for a mistrial, asserting that the prosecution's question intimated that the tape had been tampered with by the defendant. The trial court denied the motion, but instructed the prosecutor to inform the jury that the question was not meant to imply that defense counsel had tampered with the tape.

The *ABA Standards for Criminal Justice*, "The Prosecution Function," § 3–5.-7(d) (2d ed. 1980), states as follows: "It is unprofessional conduct for a prosecutor to ask a question which implies the existence of a factual predicate for which a good faith belief is lacking." Here, the prosecuting attorney acknowledged at trial that his use of the word "erased" was inappropriate, and that he meant only to convey that the tape contained blank spots instead of answers to questions. The trial court's ruling adequately alleviated any prejudice produced by the prosecutor's remarks. Thus, while we agree that the question was ill-considered and violated the spirit of fair dealing embodied in ABA Standard 3–5.7(d), we do not find it illustrative of any pattern of unprofessional conduct by the prosecutor during this lengthy trial. The trial court did not err in denying defendant's motion for mistrial.

Defendant finally asserts that the prosecutor improperly objected to defendant's request to continue the subpoena of a prosecution witness. Defendant argues that this conduct evidences a continuous pattern of unethical and non-cooperative conduct by the prosecutor. Defendant did not obtain a court order requiring advance notice of the order in which prosecution witnesses were to be presented, however, and the prosecutor's objections to the request for continuance of the subpoena of the particular witness in question was based on interests of the witness and her parents rather than any effort to harass defendant's counsel. Neither in isolation nor cumulatively were these instances of alleged misconduct so prejudicial as to deprive defendant of due process of law.

For the foregoing reasons, defendant's convictions of charitable fraud, second degree forgery and conspiracy to commit charitable fraud and second degree forgery are reversed. In all other respects the judgment of conviction is affirmed.