2015 COA 1

**The PEOPLE of the State of Colorado, Plaintiff–Appellee,**

v.

**Logan Scott MCCLELLAND, Defendant–Appellant.**

**Court of Appeals No. 11CA2040**

Colorado Court of Appeals, Div. I.

Announced January 15, 2015

Rehearing Denied April 2, 2015

John W. Suthers, Attorney General, Victoria M. Cisneros, Assistant Attorney General, Denver, Colorado, for Plaintiff–Appellee.

Douglas K. Wilson, Colorado State Public Defender, Mark Evans, Deputy State Public Defender, Denver, Colorado, for Defendant–Appellant.

Opinion by JUDGE TAUBMAN

¶1 Defendant, Logan Scott McClelland, appeals the judgment of conviction entered on a jury verdict finding him guilty of reckless manslaughter. We reverse and remand for a new trial.

## I. Background

¶2 On the afternoon of August 9, 2009, McClelland accompanied his father Tom and brother Luke to a water station outside of Monument, Colorado. Tom, a water system repair technician who often traveled to remote parts of the state, frequently brought McClelland, his eighteen-year-old son, along with him because of his physical limitations. That day, the air pressure in one of their

truck's tires was low, so they travelled to a nearby repair shop.

¶ 3 As the McClellands entered the mechanic's office, they heard someone shout an expletive from one of the service bays. Tom notified the manager of the repair shop that one of his mechanics was cursing. As the McClellands waited for their repairs to be completed, another customer entered the waiting area. He informed the McClellands that he had been confronted outside by one of the store's employees. The employee, B.B., the victim, had come within a foot of the other customer's face and shouted, "So you don't like how I talk?" B.B. got close enough to head butt him, and he thought that B.B. was going to strike him. At some point during the altercation, B.B. realized he was confronting the wrong person and returned to the shop.

¶ 4 After the McClellands' truck was repaired, they paid the manager, who informed them that B.B. had been drinking and had been sent home. The repair shop had a policy of sending employees home who were found drinking on the job and then firing them the next day. When the manager confronted B.B. about Tom's complaint, B.B. demanded the complainant's identity. After he was sent home, B.B. repeatedly asked the shop's other employees questions such as who "was this fucking guy getting me in trouble and jeopardizing my job?"

¶ 5 As the McClellands drove out of the parking lot, they noticed B.B. standing next to the exit drive and looking at them. B.B. was "red faced," and several of his coworkers realized that "some kind of fight or something was going to happen." B.B., who had a reputation for starting fights when he was drunk, had a blood alcohol level of .275, as well as antidepressants and valium in his system.

¶ 6 Multiple bystanders witnessed the interaction between B.B. and the McClellands, and each presented slightly different accounts at trial.

¶ 7 The altercation started when B.B. gestured at the McClellands in a hostile manner. He was originally on the passenger side of the McClellands' truck, then came around to the driver's side where Tom was seated. When B.B. got to the driver's side, he said: "If you have something to say, get out of the truck and say it. Say it to my face." Tom and B.B. exchanged words, and there was a struggle over the door. Tom testified that B.B. opened the driver's side door, and that he pushed the door at B.B. in order to back him away from the truck.

¶ 8 During the altercation between Tom and B.B., McClelland reached into his father's backpack and removed a handgun. He exited the passenger door, came around the front of the truck, and shot B.B. seven times in rapid succession. B.B. died at the scene.

¶ 9 McClelland was charged with one count of first degree murder. He pleaded not guilty and defended on the ground that he had acted in defense of himself and his father.

¶ 10 At trial, the primary factual disputes concerned the McClelland family's perception of events. Tom and his other son Luke both testified that B.B. stuck his arms and head through the passenger window and shouted at them. They further testified that after B.B. came around to the driver's side, B.B. physically struck and grabbed Tom, knocking his glasses off. The testimony of other witnesses varied concerning whether Tom was inside or outside the truck when the shooting took place, and many witnesses testified that their attention was not drawn to the situation until after the shooting began.

¶ 11 The jury acquitted McClelland of first and second degree murder, but found him guilty of reckless manslaughter. The trial court sentenced him to six years in the custody of the Department of Corrections.

¶ 12 McClelland makes four contentions on appeal: (1) the trial court erred by not giving a self-defense law instruction on the reckless manslaughter charge; (2) the trial court abused its discretion by admitting three "in life" photographs depicting B.B. participating in family events; (3) the prosecutor committed misconduct in closing arguments by misstating the testimony of several eyewitnesses; and (4) the trial court erred

by denying a challenge for cause to a prospective juror.

## II.   Jury Instruction

¶ 13 McClelland contends that the trial court erred by not giving the jury a "self-defense law instruction" on the charge of reckless manslaughter.  We agree.

### A.   Standard of Review

¶ 14 We review de novo whether a particular jury instruction correctly states the law.  *Fishman v. Kotts*, 179 P.3d 232, 235 (Colo. App. 2007).  However, we review for an abuse of discretion a trial court's decision to give a particular jury instruction.  *Day v. Johnson*, 255 P.3d 1064, 1067 (Colo. 2011).

¶ 15 McClelland did not object to the jury instructions; therefore, we review for plain error.  *People v. Miller*, 113 P.3d 743, 749 (Colo. 2005).  Plain error addresses error that is both "obvious and substantial."  *People v. Stewart*, 55 P.3d 107, 120 (Colo. 2002) (internal quotation marks omitted).  It must be seriously prejudicial and "so undermine[ ] the fundamental fairness of the proceeding itself as to cast serious doubt on the reliability of the judgment of conviction."  *People v. Hagos*, 2012 CO 63, ¶ 14, 288 P.3d 116, 120 (quoting *People v. Sepulveda*, 65 P.3d 1002, 1006 (Colo. 2003)).

¶ 16 Plain errors must also be "so clear-cut, [and] so obvious, that a trial judge should be able to avoid [them] without benefit of objection."  *People v. Pollard*, 2013 COA 31, ¶ 39, 307 P.3d 1124, 1133.  For an error to be obvious, it must contravene (1) a clear statutory command;  (2) a well-settled legal principle;  or (3) Colorado case law.  *Id.* at ¶¶ 40–41, 307 P.3d at 1133; *see also People v. Ujaama*, 2012 COA 36, ¶ 42, 302 P.3d 296, 304; *People v. McBride*, 228 P.3d 216, 222 (Colo. App. 2009); *People v. Mosley*, 167 P.3d 157, 161–62 (Colo. App. 2007).

### B.   Applicable Law

¶ 17 There are two types of defenses in criminal cases:  (1) affirmative defenses that admit the defendant's commission of the elements of the charged act, but seek to justify, excuse, or mitigate the commission of the act;  and (2) traverses that effectively refute the possibility that the defendant committed the charged act by negating an element of the act.  *People v. Pickering*, 276 P.3d 553, 555 (Colo. 2011).

¶ 18 When a defendant alleges an affirmative defense and presents some minimal evidence to support it, the trial court must instruct the jury that the prosecution has the burden of proving beyond a reasonable doubt that the affirmative defense is inapplicable.  *Id.* at 556; *People v. Lane*, 2014 COA 48, ¶ 16, 343 P.3d 1019, 1023–24.  However, "[w]ith respect to crimes requiring recklessness, criminal negligence, or extreme indifference, such as reckless manslaughter, self-defense is not an affirmative defense, but rather an element-negating traverse." *Pickering*, 276 P.3d at 556.  In such cases, the defendant is not entitled to a jury instruction on self-defense as an affirmative defense. *Id.*  This is because it is impossible for a defendant to act both recklessly and in self-defense. *Id.*

¶ 19 Section 18–1–704(4), C.R.S. 2014, applies when a defendant who is charged with a crime requiring recklessness, criminal negligence, or extreme indifference presents evidence of self-defense.  It provides:

> If the defendant presents evidence of self-defense, the court shall instruct the jury with a self-defense law instruction.  The court shall instruct the jury that it may consider the evidence of self-defense in determining whether the defendant acted recklessly, with extreme indifference, or in a criminally negligent manner.  However, the self-defense law instruction shall not be an affirmative defense instruction and the prosecuting attorney shall not have the burden of disproving self-defense.

¶ 20 In *Pickering*, the supreme court explained that section 18–1–704(4) requires "trial courts to instruct the jury in such cases regarding the law of self-defense and to explain to the jury that it may consider evidence of self-defense in determining whether a defendant acted recklessly or with extreme indifference or with criminal negligence." 276 P.3d at 556; *see also Bachofer*, 192 P.3d at 463 ("The trial court should instruct the

jury that, in determining whether the defendant acted recklessly, it must consider whether the defendant reasonably believed it necessary for him to defend himself or another person from the victim's use or imminent use of unlawful physical force."); *People v. Roberts*, 983 P.2d 11, 14 (Colo. App. 2008) (holding that section 18–1–704(4) requires the trial court to define self-defense and explain how it relates to the pertinent elements of the charged offense).

¶ 21 In *People v. Duran*, 272 P.3d 1084, 1099 (Colo. App. 2011), a division of this court considered the meaning of section 18–1704(4)'s "self-defense law instruction." The division concluded that a "self-defense law instruction" must include all the elements of "self-defense law" in Colorado, as outlined in sections 18–1–704(1)(3). *Id.* (holding that section 18–1–704(4) "mandates provocation and initial aggressor instructions in cases where self-defense is asserted as an element-negating offense").

¶ 22 These decisions are reflected in the 2014 Model Criminal Jury Instructions, which were not in effect at the time of McClelland's trial. Those instructions contain a "self-defense law instruction" for cases in which a defendant asserts self-defense against charges with a mens rea of recklessness, extreme indifference, or criminal negligence. *See* COLJI–Crim. H:14 (2014).[1]

### C. Jury Instruction Analysis

■■■ ¶ 23 Here, Instruction Number 18 correctly instructed the jury on the elements of the affirmative defense of self-defense applicable to the charges of first and second degree murder.[2] Instruction Number 19, which addressed the applicability of self-defense to the reckless manslaughter count, stated:

> You may consider evidence of self-defense in determining whether the defendant acted recklessly or with criminal negligence. However, the affirmative defense instruction (Instruction No. 18) does not apply to Reckless Manslaughter or Criminally Negligent Homicide.

¶ 24 Thus, Instruction Number 19 informed the jury that, when considering the charge of reckless manslaughter, it could consider "evidence of self-defense," while simultaneously advising it that Instruction Number 18, the only jury instruction describing the law of self-defense in Colorado, did not apply. Therefore, the only self-defense instruction the jury received on the count of reckless manslaughter was that it "could consider evidence of self-defense." In doing so, Instruction Number 19 conflicted with section 18–1–704(4)'s requirement that the trial court give the jury a "self-defense law instruction" outlining the elements of self-de-

---

1. We note that the model instruction stating the elements for reckless manslaughter includes an optional element which states: "and that the defendant's conduct was not legally authorized by the affirmative defense[s] in Instruction[s] ___." COLJI–Crim. 3–1:09 (2014). The instruction does not include a cross reference to COLJI–Crim. H:14, which defines the element negating traverse of self-defense to reckless manslaughter.

2. Instruction Number 18 stated:

    It is an affirmative defense to the crime of Murder in the First degree After Deliberation and Murder in the Second Degree that the defendant used deadly physical force:
    1. In order to defend himself or a third person from what he reasonably believed to be the use or imminent use of unlawful physical force by the victim, and
    2. He used a degree of force which he reasonably believed to be necessary for that purpose, and
    3. He reasonably believed a lesser degree of force was inadequate, and

    4. He had reasonable grounds to believe, and did believe, that he or another person was in imminent danger of being killed or of receiving great bodily injury.

    The defendant is not required to retreat in order to claim the right to employ force in his defense.

    The defendant is not justified in using physical force if:
    1. With intent to cause bodily injury or death to another person,
    2. He provoked the use of unlawful physical force by that person.

    In addition to proving all of the elements of th [sic] crime charged beyond a reasonable doubt, the prosecution also has the burden to disprove the affirmative defense beyond a reasonable doubt.

    After considering the evidence concerning the affirmative defense, with all the other evidence in this case, if you are not convinced beyond a reasonable doubt of the defendant's guilt, you must return a verdict of not guilty.

fense law in Colorado. *See Duran,* 272 P.3d at 1099. Because Instruction Number 19 directed the jurors not to apply Instruction Number 18, which explained the legal meaning of self-defense, the jurors received no guidance as to the meaning of self-defense with respect to the offense of reckless manslaughter. A proper instruction would have included all the elements of self-defense law, including the right to defend third parties and the right to stand one's ground without retreating.

¶ 25 Therefore, we conclude that the trial court erred in not giving a self-defense law instruction on the charge of reckless manslaughter, as required by section 18–1–704(4).

### D. Plain Error Analysis

■ ¶ 26 As noted, we review the trial court's instructional error for plain error. First, we conclude that the trial court's error was seriously prejudicial to McClelland. This was a case which required a thorough understanding of self-defense law. The primary issue at trial was whether McClelland acted in defense of his father when he shot B.B. McClelland told the police that he saw a bulge in B.B.'s pocket and thought that he had a knife. The defense established that Tom, significantly overweight, was prone to heart attack and stroke, and that his mobility was hampered by pins in his legs. McClelland claimed that he acted only after B.B. had reached through the truck window, struck Tom, and attempted to pull his ailing father from the vehicle. McClelland argued that he reasonably believed his father faced an imminent threat of serious bodily injury.

¶ 27 The People pointed out that Tom could have kept driving past B.B. as he waited at the repair shop's exit drive. They argued that Tom's decision to stop the truck was a voluntary decision to engage B.B. in an argument. The People further argued that McClelland had other weapons at his disposal, including a sledge hammer, with which he could have protected his father. In their view, McClelland's decision to pull the handgun out of his father's bag implied premedi-

tation and deliberation, sufficient to convict him of first degree murder.

¶ 28 As noted, the jury acquitted McClelland of first and second degree murder. On those counts, the trial court properly instructed the jury on self-defense by giving Instruction Number 18 that included all the elements of self-defense law. In contrast, McClelland was convicted of reckless manslaughter, for which the trial court did not give an adequate self-defense law instruction.

¶ 29 Finally, the jury could have convicted McClelland of criminally negligent homicide,[3] a less serious felony with a presumptive sentencing range of half that of reckless manslaughter. See §§ 183–105 (criminally negligent homicide is a class five felony), 18–3104, C.R.S. 2014 (reckless manslaughter is a class four felony), 18–1.3–401(I)(V)(A), C.R.S. 2014 (class five felonies have a presumptive sentencing range of one to three years imprisonment, whereas class four felonies have a presumptive sentencing range of two to six years). At the very least, a proper self-defense law instruction might have led the jury to convict McClelland of a less serious crime.

¶ 30 Accordingly, we conclude the error cast serious doubt on the fairness of McClelland's conviction because the court did not give an adequate self-defense law instruction on the reckless manslaughter count.

■ ¶ 31 Next, we conclude that the court's error was obvious. By not giving the self-defense law instruction, the court violated a clear statutory command and Colorado case law directly on point. *See* § 18–1–704(4); *Pickering,* 276 P.3d at 556; *Duran,* 272 P.3d at 1099; *Bachofer,* 192 P.3d at 463 (Contradictory jury instructions regarding self-defense are "plainly wrong."); *Roberts,* 983 P.2d at 14.

¶ 32 Even if we assume that the exact scope of the "self-defense law instruction" required by section 18–1–704(4) is ambiguous, it should have been obvious to the trial court that Instruction Number 19 would have confused or misled the jury. Instruction

---

3. The jury did not render a verdict on the lesser included offense of criminally negligent homicide on which it was instructed because it was also

instructed that it could find McClelland guilty of only one lesser included offense.

Number 19 informed the jury that the only instruction explaining the law of self-defense did not apply to the charge of reckless manslaughter. Thus, Instruction Number 19 could have led the jurors to erroneously conclude that self-defense, as applicable to the charge of reckless manslaughter, did not give McClelland a right to protect his father from B.B., and that McClelland could not act in self-defense, even if he reasonably believed his father was in imminent danger of receiving great bodily injury. Instruction Number 19 could also have led the jurors to erroneously conclude that McClelland and his father had a duty to retreat—an important point because the prosecutor contended that Tom McClelland could have locked his door and driven away.

¶ 33 Therefore, we conclude that the trial court committed plain error requiring reversal of McClelland's conviction when it did not give the jury a self-defense law instruction on the charge of reckless manslaughter.

### III.  Burden Shift

¶ 34 McClelland also contends that the trial court erred by placing the burden on him to prove self-defense to the charges of reckless manslaughter and criminally negligent homicide. Because this issue may arise on remand, we address it here.

¶ 35 McClelland asserts that in *Smith v. United States,* 568 U.S. ——, ——, 133 S.Ct. 714, 719, 184 L.Ed.2d 570 (2013), the United States Supreme Court implicitly overruled the supreme court's holding in *Pickering,* discussed above, that the prosecution does not have the burden of disproving self-defense with respect to crimes involving recklessness or criminal negligence. 276 P.3d at 557.

¶ 36 In *People v. Lane,* a division of this court rejected an identical argument, concluding that "*Smith* did not overrule *Pickering.*" ¶ 19, 343 P.3d at 1024. The division concluded that *Smith* and *Pickering* addressed different issues: "*Pickering* concerned whether a jury instruction shifted the burden of proving an *element of the offense* to a defendant. *Smith,* in contrast, focused on the propriety of shifting the burden of proving a particular *affirmative defense* to a

defendant." *Id.* at ¶ 18, 343 P.3d at 1024 (emphasis in original) (citation omitted).

¶ 37 We reject McClelland's contention based on the reasoning of the division in *Lane.*

### IV.  "In Life" Photographs of B.B.

¶ 38 McClelland contends that the trial court abused its discretion when it admitted three "in life" photographs of B.B., depicting him participating in family events. Specifically, he contends that the "in life" photos were not relevant and that their probative value was substantially outweighed by the risk of unfair prejudice. Because this issue may also arise on remand, we address it here.

¶ 39 While we conclude that the photographs were relevant to the charges against McClelland, we further conclude that the trial court erred in admitting them under the circumstances presented here because their probative value was substantially outweighed by the risk of unfair prejudice.

### A.  Standard of Review

¶ 40 We review a trial court's evidentiary rulings for an abuse of discretion. *People v. Melillo,* 25 P.3d 769, 773 (Colo. 2001). An abuse of discretion occurs when a trial court's ruling is manifestly arbitrary, unreasonable, or unfair. *Id.*

### B.  Applicable Law

¶ 41 To be admissible, evidence must be relevant. CRE 402. Evidence is relevant when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." CRE 401.

¶ 42 A trial court may exclude logically relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice." CRE 403. While CRE 403 favors the admission of evidence, "the rule is an important tool to exclude matters of scant or cumulative probative force." *Yusem v. People,* 210 P.3d 458, 467 (Colo. 2009)

(internal quotation marks and alterations omitted).

¶ 43 Unfairly prejudicial evidence has an "'undue tendency to suggest a decision on an improper basis, commonly but not necessarily an emotional one, such as sympathy, hatred, contempt, retribution, or horror.'" *People v. Herrera,* 2012 COA 13, ¶ 41, 272 P.3d 1158, 1166 (citing *Masters v. People,* 58 P.3d 979, 1001 (Colo. 2002)).

¶ 44 CRE 403 balancing involves consideration of the availability of alternative means of proof, whether the fact of. consequence for which the evidence is offered is disputed, and the importance of the fact of consequence for which the evidence is offered. *Yusem,* 210 P.3d at 467; *Vialpando v. People,* 727 P.2d 1090, 1096 (Colo. 1986).

¶ 45 Photographs are admissible if they depict relevant facts and are not unnecessarily inflammatory so as to incite the jury to unfair prejudice against the defendant. *See People v. Moreland,* 193 Colo. 237, 243, 567 P.2d 355, 360 (1977); *Hampton v. People,* 171 Colo. 153, 166, 465 P.2d 394, 401 (1970).

¶ 46 Several Colorado appellate courts have held that "in life" photographs of homicide victims are admissible. *See People v. Loscutoff,* 661 P.2d 274, 277 (Colo. 1983) (no abuse of discretion in admitting photographs of a murder victim and her young son, taken several months before the murder); *People v. Clary,* 950 P.2d 654, 658 (Colo. App. 1997) (no abuse of discretion in admitting enlarged school photograph of victim); *People v. T.R.,* 860 P.2d 559, 562 (Colo. App. 1993) (no abuse of discretion in admitting photographs of victim and her husband taken eight months before the victim was killed). However, our courts have not adopted a per se rule allowing "in life" photographs of homicide victims; rather, each decision applied CRE 403's balancing test to determine whether the probative value of the "in life" photographs was substantially outweighed by the risk of unfair prejudice to the defendant.

¶ 47 Alternatively, various other jurisdictions have held that "in life" photographs of homicide victims were inadmissible because of their minimal probative value and the danger that their introduction is merely a means of "engendering sympathy for the victim with the intent of creating an atmosphere of prejudice against the defendant." *Commonwealth v. Rivers,* 537 Pa. 394, 644 A.2d 710, 716 (1994); *see Wilks v. State,* 49 P.3d 975, 983 (Wyo. 2002) ("Admission of homicide victims' 'in life' photographs is discouraged and should be permitted under only very limited circumstances where their relevancy outweighs the potential to inflame the jury."); *see also United States v. Pettigrew,* 468 F.3d 626, 638 (10th Cir. 2006) ("The proffering of a photograph of the deceased victim, while living and posed with her family, as opposed to a photo depicting only the decedent, 'needlessly pushes the prosecutorial envelope, and could, if coupled with errors not present here, jeopardize a conviction.'" (quoting *United States v. Jones,* 24 Fed.Appx. 968, 975 (10th Cir. 2001))); *Valdez v. State,* 900 P.2d 363, 381 (Okla. Crim. App. 1995) ("In life" photos inadmissible if they have no probative value.), *superseded by statute as stated in Coddington v. State,* 142 P.3d 437 (Okla. Crim. App. 2006).

¶ 48 These cases establish that "in life" photographs of homicide victims are not per se inadmissible; rather, their admissibility must be determined on a case by case basis. The parties have not identified, nor have we found, any Colorado appellate cases addressing the admissibility of "in life" photographs of a homicide victim where, as here, the defendant claims he acted in self-defense.

### C. Analysis

¶ 49 The People introduced the photographs of B.B. to establish that he was alive prior to the shooting. Evidence that B.B. was once alive was of consequence to the charges of murder and reckless manslaughter because both crimes require proof that the defendant "caused the death of a person." Therefore, we conclude that the three "in life" photographs were relevant.

¶ 50 Turning to the CRE 403 balancing, we first address the probative value of the three "in life" photographs. "[E]vidence offered to prove undisputed facts has marginal probative value." *Yusem,* 210 P.3d at 468; *see also Masters,* 58 P.3d at 1001;

*Vialpando*, 727 P.2d at 1096. Neither B.B.'s identity as the victim, nor whether he was alive at the time of the shooting was disputed. These facts were established by eyewitness testimony, and neither was important to the central issue at trial—whether McClelland's use of force was reasonable. In short, the "in life" photographs were evidence of an undisputed fact.

¶ 51 We next address the danger of unfair prejudice. The central issue in the case was the reasonableness of McClelland's use of deadly force. This required the jury to evaluate B.B.'s conduct during the confrontation with the McClellands, including his physical appearance and demeanor immediately prior to the shooting.

¶ 52 The three "in life" photographs portrayed a different image of B.B. than that presented by the eyewitness testimony, on which the prosecution unfairly capitalized during its opening and closing arguments. The testimony established that B.B. was yelling and intoxicated immediately prior to the shooting.

¶ 53 Conversely, the three "in life" photographs of B.B. depicted a man smiling in the company of his immediate family members. One depicted B.B. with his son on his son's wedding day. In another, he was flanked by his father and son at a car show.

¶ 54 Further, the People's continual reference to the "in life" photographs and emphasis on B.B.'s family heightened the likelihood that the jury's decision was based on sympathy. The People's opening statement started with a reference to one of the photographs:

This is [B.B.]. He was somebody's father. Somebody's son. Somebody's brother. Recently he would have become a grandfather. He was a fan of NASCAR, Dale Earnhardt in particular. He was a mechanic. His father, Del, would describe him as an exceptional mechanic. [B.B.] was 50 years old when he was needlessly and brutally murdered by the defendant, Logan McClelland.

In their initial closing argument, the People reiterated that, "[B.B.] was somebody's father. Somebody's son. [Somebody's] brother. Somebody's friend." Similarly, in rebuttal closing argument, the People stated, "[B.B.] is not a ticking time bomb. He is a human being. He's somebody's father. Somebody's brother. Somebody's friend."

¶ 55 We conclude that the admission of the three "in life" photographs unfairly prejudiced McClelland under the circumstances presented here. McClelland asserted he was acting in defense of himself and his father, and B.B.'s demeanor immediately prior to the shooting was a crucial issue at trial. The only visual depiction of B.B. the jury saw portrayed a different image than that presented by the eyewitness testimony. *See People v. Sepeda*, 196 Colo. 13, 22, 581 P.2d 723, 730 (1978) ("As has been said, one picture is worth a thousand words....").

¶ 56 Because the three "in life" photographs had almost no probative value, and because the prosecutor sought to elicit the jury's sympathy based on those photographs during opening statement, trial testimony, and closing arguments, we conclude that the admission of the three "in life" photographs unfairly prejudiced McClelland.[4]

¶ 57 Therefore, we further conclude that the trial court erred when it admitted three "in life" photographs of B.B. However, the prosecution is not necessarily prohibited from introducing "in life" photographs of B.B. on retrial. Rather, on retrial, the court should reconsider whether to allow "in life" photographs in light of the above discussion, and if so, how many, and whether to limit the prosecution's comments about them so as to avoid the risk of unfair prejudice.

## V. Other Contentions

¶ 58 Finally, McClelland contends that (1) the trial court erred by denying a challenge for cause to a prospective juror and (2) the prosecutor committed misconduct in closing

---

4. We recognize that the photographs' unfair prejudice may have been limited, since the jurors acquitted McClelland of first and second degree murder. Nevertheless, along with the inadequate self-defense law instruction discussed in Part II *supra*, the photographs may have persuaded the jury to convict McClelland of reckless manslaughter, believing that he was guilty of some offense.

arguments by misstating the testimony of several eyewitnesses.

¶ 59 We note that both parties agree that portions of the People's closing argument were factually incorrect. Specifically, the prosecutor told the jury that "all the witnesses" were in agreement "that Tom McClelland was out of the truck," at the time of the shooting, when in fact there was no such unanimous agreement. Presumably, whether Tom was outside the truck at the moment of the shooting had some bearing on the imminence of the threat he faced, and therefore, the reasonableness of McClelland's conduct.

¶ 60 Nevertheless, we assume that on retrial, the prosecutor's closing argument will not misstate the evidence. Similarly, because of our resolution of the instruction issue, we need not consider McClelland's contention that the district court erred in denying his challenge for cause to a potential juror.

## VI.  Conclusion

¶ 61 The judgment is reversed and the case is remanded for a new trial consistent with this opinion.

JUDGE TERRY and JUDGE RICHMAN concur.