23CA1175 Peo v Doctor 02-20-2025

COLORADO COURT OF APPEALS

Court of Appeals No. 23CA1175
Montezuma County District Court No. 22CR162
Honorable Todd Jay Plewe, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Gabrielle D. Juan Doctor,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division IV
Opinion by JUDGE PAWAR
Harris and Grove, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced February 20, 2025

Philip J. Weiser, Attorney General, Frank R. Lawson, Senior Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Benjamin B. Currier, Deputy State Public Defender, Mallory Taub, Deputy State Public Defender, Durango, Colorado, for Defendant-Appellant

¶ 1    Defendant, Gabrielle D. Juan Doctor, appeals the judgment of conviction entered after a jury found him guilty of multiple criminal charges stemming from a car and motorcycle collision resulting in death. We affirm.

I.    Background

¶ 2    While driving his car, Doctor struck the victim motorcyclist, Travis Beeson, who later died from his injuries. When police arrived at the scene, Doctor told them he was turning left into oncoming traffic, the sun was in his eyes, and he did not see the motorcycle until it was too late. Doctor was driving with his nephew and his six-year-old niece, who was unrestrained, in the backseat, and he admitted that he did not have insurance and was not wearing the corrective lenses required by his driver's license.

¶ 3    After administering horizontal gaze nystagmus (HGN) tests,[1] law enforcement arrested Doctor under suspicion of driving while ability impaired (DWAI). A blood toxicology test taken two hours after the collision reflected that Doctor's blood alcohol content (BAC) was .057 g/100 mL and his THC level was 4.2 ng/mL. Doctor told

_____

[1] An HGN test seeks to detect an involuntary jerking of the eyes associated with impairment.

1

police he had been drinking the night before and into the morning of the accident. Police found several empty alcohol containers in his car, as well as a makeshift pipe with burnt marijuana residue in his driver's side door.

¶ 4 The prosecution charged Doctor with vehicular homicide (DWAI); criminally negligent homicide; DWAI; child abuse (negligence, no injury); careless driving resulting in death; compulsory insurance; failure to yield right of way; and no child restraint. A jury acquitted him of vehicular homicide and criminally negligent homicide but found him guilty of the remaining charges.

¶ 5 Doctor appeals, arguing that the trial court erred by (1) denying his motion to suppress evidence obtained during a roadside sobriety test and (2) allowing the prosecution to display an in-life photograph of the decedent at trial. Doctor also claims the prosecutor engaged in misconduct during closing argument.

## II. Motion to Suppress

### A. Applicable Law

¶ 6 Appellate review of a trial court's order on a motion to suppress presents mixed questions of law and fact. *People v. Kessler*, 2018 COA 60, ¶ 16. We review the trial court's factual

findings for clear error, but we review de novo the court's legal conclusions. *Id.*

¶ 7 A roadside sobriety test is a full search in the constitutional sense and, as relevant here, can be administered when the driver voluntarily consents to perform the test. *People v. Young*, 2024 COA 1, ¶ 11. To assess whether a person's consent was voluntary, we consider the totality of the circumstances and apply an objective test to determine whether the defendant could reasonably have construed the police conduct to be coercive. *Id.* at ¶ 12. Consent is involuntary when it results from duress, coercion, or any other form of undue influence exercised by the police against the defendant. *Id.* at ¶ 13.

¶ 8 Police officers are entitled to conduct an investigatory stop of a motorist if they have reasonable suspicion that the motorist has committed or is about to commit a crime. *People v. Ramos*, 13 P.3d 295, 297 (Colo. 2000). However, "once the purpose of an initially valid investigatory stop has been satisfied, any further detention or questioning of the driver of a vehicle constitutes unreasonable and therefore unlawful detention prohibited by the Fourth Amendment." *People v. Redinger*, 906 P.2d 81, 85 (Colo. 1995).

## B.    Additional Facts

¶ 9      Officer Sharp and Sergeant Edwards responded to the scene of the accident.  Sharp was new to the force, while Edwards had years of experience.  Edwards smelled alcohol while standing with Doctor and his family and directed Sharp to proceed with a DUI investigation.

¶ 10     Sharp asked Doctor if he would be willing to perform voluntary roadside sobriety maneuvers.  Doctor declined to perform the walk-and-turn and one-leg stand test due to a knee injury, but consented to a HGN test.  Sharp did not see any signs of impairment from the test.

¶ 11     Edwards, unsure about Sharp's assessment, asked Doctor if he could look at his eyes "real fast."  Doctor agreed, and after administering a second HGN test, Edwards observed four out of six clues showing impairment.

## C.    Discussion

¶ 12     Doctor argues the trial court erred by concluding that his consent to the second HGN test was knowing and voluntary.  He further argues that because the police's reasonable suspicion of him dissipated after he satisfactorily completed the first HGN test,

the second HGN test exceeded the bounds of a permissible investigatory stop. We are not persuaded.

¶ 13 Doctor concedes that he consented to the first HGN test administered by Sharp. But he argues that his consent to the second HGN was not knowing because he did not know Edwards was asking to conduct further sobriety examinations. Rather, he says he understood Edwards' request to look in his eyes as a request to observe him, not to subject him to additional testing. That is, he does not disagree that he uttered words of consent, but he argues that he did not consent to *testing*.

¶ 14 The trial court disagreed, finding that "[i]n the context of the situation, any reasonable person would have understood that [] Edwards was asking to repeat the HGN test that [] Sharp had performed." The record supports this finding. The trial court considered testimony from both officers and reviewed footage obtained from body cameras they wore during their interactions with Doctor. It noted that Doctor was present when Edwards asked Sharp if he could double check the results of the first HGN, and Doctor "should have heard this interaction." Also, Edwards' request to look at Doctor's eyes a second time came immediately after Sharp

completed the first HGN test.[2]  We agree with the trial court that this context should have indicated to Doctor that Edwards sought to continue the roadside sobriety test that was already in progress. Accordingly, we conclude Doctor's consent to the second HGN test was voluntary.

¶ 15    Doctor next asserts that the second HGN test exceeded the bounds of a permissible investigatory stop because, after Sharp saw no signs of impairment, the police no longer had reasonable suspicion to conduct their investigation.  We disagree.

¶ 16    As an initial matter, as we just discussed, Doctor consented to the second test, thereby making it a consensual interaction.  That is, the police had permission to detain Doctor via his consent.

¶ 17    In any event, based on the undisputed body camera recordings, the trial court found that "[a]lmost directly after Officer Sharp completed the HGN test, Sgt[.] Edwards first asked Officer Sharp what result he got from the HGN and when Officer Sharp said 'good,' Sgt. Edwards asked if Officer Sharp minded if he

---

[2] Doctor does not dispute the trial court's summary of the body camera recordings.  Because the recordings are omitted from the record on appeal, we must assume they support the trial court's findings.  *See People v. Schupper*, 2014 COA 80M, ¶ 31 n.3.

checked." The court credited Edwards' testimony that he doubted Sharp's initial conclusion, noting that "Edwards was acting in a training role for a much less experienced officer," and "[i]t is not unreasonable to believe that [he] was more attuned to perceiving evidence" than Sharp.

¶ 18 Based on this record, we conclude the second HGN test was part of a reasonable investigatory stop. Sharp's statement to Edwards that the first HGN test was "good" was part of their ongoing investigation, not a statement to Doctor that the investigation had ended. Viewed in that context, even after the first HGN test, the police continued to have reasonable suspicion that Doctor had committed a crime. *See Ramos*, 13 P.3d at 297. Because the purpose of the investigatory stop was ongoing, we conclude the second HGN test was part of a reasonable detention. *See Redinger*, 906 P.2d at 85.

### III. Admission of In-Life Photograph

#### A. Applicable Law

¶ 19 Generally, evidence is admissible if it is relevant — that is, if it tends to make the existence of any consequential fact more or less probable than it would be without the evidence. CRE 401; CRE

7

402; *Rojas v. People*, 2022 CO 8, ¶ 25.  But relevant evidence must be excluded if its probative value is substantially outweighed by the danger of unfair prejudice.  CRE 403.  Before admitting "in-life" photographs of homicide victims, the trial court must apply CRE 403's balancing test.

¶ 20      We review a trial court's evidentiary rulings for an abuse of discretion.  *People v. McClelland*, 2015 COA 1, ¶ 40.  An abuse of discretion occurs when a trial court's ruling is manifestly arbitrary, unreasonable, or unfair.  *Id.*  We review nonconstitutional errors that were preserved by objection for harmless error.  *Hagos v. People*, 2012 CO 63, ¶ 12.  Under this standard, an erroneous evidentiary ruling does not require reversal unless it substantially influenced the verdict or affected the fairness of the trial proceedings.  *Id.*

## B.    Additional Facts

¶ 21      The victim's father testified at trial.  During his testimony, and over defense counsel's objection, the trial court allowed the prosecution to display for the jury a photograph of the victim as he appeared months before the accident — smiling with Christmas lights behind him.  The court concluded that because the jury had

already seen a picture of the injured victim at the accident, the in-life photograph was probative "to see what he looked like before that."

¶ 22    Following the testimony, defense counsel moved for a mistrial because two jurors were crying after the photograph was displayed. The trial court denied the motion. It also allowed the prosecutor to display the in-life photograph during closing argument, again over defense counsel's objection.

## C.    Discussion

¶ 23    As noted, CRE 403 requires a court to conduct a balancing test to weigh the probative value of evidence against the risk of unfair prejudice. While the trial court identified some probative value for the evidence (beyond that argued by the prosecution), it did not explicitly address the danger of unfair prejudice. But even if we assume without deciding that the photograph's risk of unfair prejudice outweighed its probative value, we conclude the error was harmless.

¶ 24    Recall that the jury acquitted Doctor of vehicular homicide and criminally negligent homicide. "While a split verdict does not conclusively decide the harmlessness question, it is 'an indication

9

that the jurors exercised some discretion in their deliberations' and that the error did not cause them to 'blindly convict the defendant.'" *Washington v. People*, 2024 CO 26, ¶ 35 (citation omitted).

¶ 25    Doctor points to *McClelland* to urge us to reach a different conclusion. There, the division concluded that the court's error in admitting in-life photographs under CRE 403 was not harmless, despite the jury's split verdict, because the photographs may have persuaded the jury to convict McClelland of a different offense (reckless manslaughter). *See McClelland*, ¶ 56 n.4. But even the *McClelland* division recognized that unfair prejudice may be limited when there is a split verdict, and it found reversible error based on the photographs' influence "along with" a plainly erroneous self-defense jury instruction. *Id.* We have found no similarly reversible error here, and we see no similar risk of unfair prejudice because Doctor's convictions were for counts wholly different from the homicide counts and supported by independently strong evidence. For example:

- Undisputed evidence established that Doctor turned left into oncoming traffic, did not have insurance, and did not have his child in a booster seat, supporting his

convictions for failure to yield, compulsory insurance, no child restraint, child abuse. In fact, during closing argument, defense counsel made no attempt to argue that Doctor was not guilty of these offenses.

- Substantial undisputed evidence also supported the careless driving resulting in death conviction. That the collision caused the victim's death was undisputed, and the jury heard evidence that Doctor drove without wearing his prescription lenses, turned into oncoming traffic while the sun was in his eyes, and failed to block the sun with his hand so he could see. It also heard that Doctor reported he had been drinking the night before and into the morning of the collision. Indeed, defense counsel acknowledged during closing argument that Doctor made some mistakes on the day of the accident, including by failing to shield his eyes from the sun.

- Substantial evidence likewise supported the DWAI conviction. A person commits DWAI if they "drive[] a motor vehicle or vehicle while impaired by alcohol or by one or more drugs, or by a combination of alcohol and

11

one or more drugs." § 42-4-1301(1)(b), C.R.S. 2024. Two hours *after* the accident, Doctor's BAC was .057 and he had THC in his system. An expert testified that it was possible this degree of impairment would prevent safe operation of a motor vehicle and that the effects of THC and alcohol increase one another. The jury was also instructed to presume that Doctor was not under the influence of alcohol if, at the time of the accident, he had .05 or less grams of alcohol per one hundred milliliters of blood.

¶ 26 Considering the jury's split verdict in combination with the strong evidence of Doctor's guilt for the nonhomicide offenses, we conclude that there is no reasonable probability the jury's sympathy for the victim substantially influenced the verdict or affected the fairness of Doctor's trial. *See Hagos*, ¶ 12.

### IV. Prosecutorial Misconduct

#### A. Applicable Law

¶ 27 A prosecutor has wide latitude during closing argument to argue all reasonable inferences that may be drawn from evidence in the record. *People v. Rhea*, 2014 COA 60, ¶ 46. However, a

prosecutor may not make comments that amount to expert testimony, refer to facts not in evidence, or make arguments that are calculated to appeal to the jury's prejudices. *See Domingo-Gomez v. People,* 125 P.3d 1043, 1049 (Colo. 2005); *People v. Davis,* 280 P.3d 51, 54 (Colo. App. 2011).

¶ 28    We review a claim of prosecutorial misconduct in two steps. *Rhea,* ¶ 40. We first determine whether misconduct occurred based on the totality of the circumstances. *Id.* If we conclude it did, we determine whether it warrants reversal according to the proper standard of review. *Id.*

¶ 29    We review a preserved claim of prosecutorial misconduct for an abuse of discretion, *People v. Monroe,* 2018 COA 110, ¶ 11, *aff'd,* 2020 CO 67, and "will only reverse if there is a reasonable probability that the error contributed to the defendant's conviction." *Id.*

B.    Discussion

¶ 30    Doctor argues he is entitled to a new trial because, during closing argument, the prosecutor held himself out as an expert in retrograde extrapolation (a method of determining a person's BAC at a point in time earlier than the draw) by opining that Doctor's

likely BAC at the time of the accident was between .077 and .107. He also argues the prosecutor argued facts not in evidence by arguing that Doctor used marijuana while children were in the vehicle. And he asserts the prosecutor attempted to inflame the jury's passions by displaying the in-life photograph of the victim and arguing that the victim "lost more than his life. His parents lost the ability to see him get married, have kids, have a successful life."

¶ 31     At the outset, we disagree that the prosecutor's argument regarding the likely range of Doctor's BAC at the time of the accident amounted to improper expert testimony. These comments were explicitly based on an expert toxicologist's testimony that Doctor had a BAC of .057 g/100 mL two hours after the accident, and the body consumes alcohol at a rate of .01 to .025 g/100 mL per hour. Multiplying each end of the range of rate of consumption by two (because Doctor's blood was drawn two hours after the accident), results in the precise range argued by the prosecutor:

.077 to .107 g/100 mL.[3]  Therefore, these comments were reasonable inferences drawn from the evidence.  *See Rhea*, ¶ 46.

¶ 32    We agree with Doctor that the prosecutor's other comments were improper.  After Doctor's initial objection to the prosecutor's statement that Doctor chose "to use marijuana while he has his family in the vehicle," the trial court ruled there was no evidence that Doctor used marijuana while driving.  Despite this ruling, the prosecutor argued again during rebuttal closing that Doctor decided "to get behind the wheel of that car to begin with and to put children into the car and then to use drugs."  This was an improper reference to facts not in evidence.[4]  *See Davis*, 280 P.3d at 52.

¶ 33    Likewise, the prosecutor's references to the victim's missed opportunities in life improperly suggested that the jury should

---

[3] Low end of the range: .01 x 2 (hours) = .02 + .057 = .077 g/100mL.
High end of the range: .025 x 2 (hours) = .05 + .057 = .107 g/100mL.

[4] The parties disagree as to whether Doctor preserved his objection to the prosecutor's second misstatement of the evidence.  But we need not decide this issue, because we conclude the prosecutor's comment was ultimately harmless, so it cannot have been plain.  *See Hagos v. People*, 2012 CO 63, ¶ 14 (plain error must impair the reliability of the judgment of conviction to a greater degree than under harmless error to warrant reversal).

reach its verdict out of sympathy for the victim, rather than based on the evidence. *See People v. McBride*, 228 P.3d 216, 223 (Colo. App. 2009) (prosecutors may not suggest that guilty verdicts are necessary to do justice for a sympathetic victim). As already discussed, the impropriety of these comments was further exacerbated by the prosecutor's display of the victim's in-life photograph during closing argument.

¶ 34 Nevertheless, we cannot conclude these comments warrant reversal. As described above, the evidence that Doctor failed to yield, lacked insurance, failed to use a child restraint, and engaged in negligent child abuse was undisputed, and the evidence of careless driving resulting in death and DWAI was strong. The prosecutor's improper comments were relatively brief and isolated, and the jury's split verdict indicates that it was able to fairly consider the evidence despite them. *See Washington*, ¶ 35.

¶ 35 Moreover, the trial court properly instructed the jury that there was no evidence that Doctor used marijuana with children in the vehicle, and it told the prosecutor to move on from his references to the victim's missed opportunities. *See People v. Tillery*, 231 P.3d 36, 43 (Colo. App. 2009) (we presume the jury

followed the court's curative instructions), *aff'd sub nom. People v. Simon*, 266 P.3d 1099 (Colo. 2011). The trial court also instructed the jury that "[s]ympathy and prejudice have no place in a criminal trial," and "[t]his case must be decided only on the evidence presented." Viewing the prosecutor's improper comments in the context of the record as a whole, we discern no reasonable probability that prosecutorial misconduct contributed to Doctor's convictions. *See Monroe*, ¶ 11.

## V. Disposition

¶ 36 The judgment is affirmed.

JUDGE HARRIS and JUDGE GROVE concur.